UNITED STATES *v.* ROBERT REINER, INC. (No. 4567) [1]

[1] C. A. D. 370.

United States Court of Customs and Patent Appeals, November 17, 1947

*Paul P. Rao*, Assistant Attorney General (*Richard F. Weeks* and *Daniel I Auster*, special attorneys, of counsel), for the United States.

*B. A. Levett* (*Meyer Ohlbaum* of counsel) for appellee.

[Oral argument October 8, 1947, by Mr. Weeks and Mr. Levett]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges

BLAND, Judge, delivered the opinion of the court:

The United States has here appealed from the decision and judgment of the United States Customs Court, Third Division, 17 Cust. Ct. 370, Reap. Dec. 6440, which affirmed the decision and judgment of the single reappraising judge, 15 Cust. Ct. 469, Reap. Dec. 6240, with reference to the dutiable value of two types of imported hosiery machines exported from Germany in 1938 and 1939 and appraised by the appraiser on the basis of section 402 (f) of the Tariff Act of 1930. The machines were entered at prices which, according to the importer's contention and the holdings of the tribunals below, represented the United States value as defined by subsection (e) of said section 402 of said act.

Throughout the proceedings it has been agreed by the parties hereto that there is no statutory foreign or export value for said machines and that if there is no statutory United States value then the costs of production in the amounts as appraised are correct.

The sole issue presented is whether or not the importer has established a statutory United States value.

This appeal involves three reappraisements, numbered 152292–A, 152293–A, and 152294–A. Reappraisement No. 152292–A involves a so-called "footer" machine of 28 sections and of 42 gauge. Reappraisement No. 152293–A involves a so-called "legger" machine of 28 sections, gauge 45. Reappraisement No. 152294–A involves a "legger" of 24 sections, gauge 45. The "footers" are types of machines which produce only the foot portion of the hosiery, while the "leggers" produce only the leg portion. The number of sections indicates the number of stockings that can be manufactured at one.

time and the gauge indicates the fineness of the stocking, the higher the gauge the finer the stocking. The merchandise involved in the three reappraisements was exported from Germany on the following dates: October 12, 1938 (152292–A); January 5, 1939 (152293–A), and March 10, 1938 (152294–A).

Section 402 (e) of the Tariff Act of 1930, prior to amendment by the Customs Administrative Act of 1938 (which amendment does not affect the issue involved herein), reads as follows:

(e) UNITED STATES VALUE.—The United States value of imported merchandise shall be the price at which *such or similar imported merchandise* is freely offered for sale, packed ready for delivery, in the principal market of the United States to all purchasers, *at the time of exportation of the imported merchandise*, in the usual wholesale quantities and in the ordinary course of trade, with allowance made for duty, cost of transportation and insurance, and other necessary expenses from the place of shipment to the place of delivery, a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or profits not to exceed 8 per centum and a reasonable allowance for general expenses, not to exceed 8 per centum on purchased goods. [Italics added.]

The facts are not in serious dispute but there is sharp conflict in the contentions of the respective parties with reference to the applicability of the law to such substantially agreed facts.

Most of the pertinent facts were set forth in the opinion of the single judge sitting in reappraisement and the appellate division also stated substantially the same facts. The trial judge stated:

The testimony of John Vallmann, the only witness who appeared herein, discloses that he is the office manager of the plaintiff corporation, which has a standing order with the German manufacturer under which there are shipped to the plaintiff monthly four or five machines identical with those involved herein; that other machines are purchased but not shipped immediately, being kept in warehouse in Germany until requisitioned; and that the relationship between the manufacturer and plaintiff is that of seller and buyer, payment in each instance being made before delivery of the machines.

The machines are sold by salesmen who canvass the hosiery manufacturing trade along the eastern seaboard of the United States. When an order is given for a particular sized machine which may not be in stock in this country or in Germany, the customer is first persuaded to accept a different sized machine before a request is made upon the factory for a machine of the correct size.

The machines are sold erected or in a knocked-down condition. If erected, an additional charge is made to cover installation and for attachments, driving mechanism, etc. Contracts between plaintiff and its customers specify no particular serially numbered machine, the plaintiff being free to deliver any machine of the type and size mentioned in the order.

It also appears from the record that if a machine was ordered from Germany with a view of supplying an accepted order of a United States customer there was no obligation on the part of appellee to furnish that identical machine to fill that particular order but it could be disposed of otherwise. The approximate selling price of each machine was $10,000. Each machine weighed about four tons.

The single reappraising judge quoted the following from the testimony:

Q. In other words, they shipped 4 or 5 machines every month on a standing order, is that it?—A. That is right.

\* \* \* \* \* \* \*

Q. Of course, we are referring to the period of these importations.—A. That is correct.

\* \* \* \* \* \* \*

Q. Now, had you imported machines of that character previously that were identical?—A. Oh, yes.

Q. And as to all three of these machines did you, during the past years, previous to 1938 import those machines right along?—A. Yes, we did.

Q. Identical with those that were in question?—A. Yes.

Q. And sold them here?—A. That is correct.

Q. And was the price uniform?—A. Yes.

Q. Over the course of years for each type of machine?—A. Yes, sir.

Q. Now, were those prices, the prices at which you entered this merchandise, that is to say, was it the price, the gross price with the statutory deductions; is that the way you made entry of these?—A. Yes.

Q. Basing it on the machines of the same character exactly that you had previously entered, is that right?—A. That is correct.

Q. And sold in this country at those prices?—A. Yes.

\* \* \* \* \* \* \*

R. Q. During all this period was it a fact that you were continually offering these goods for sale, of all kinds, throughout the country?—A. Yes.

\* \* \* \* \* \* \*

X Q. I understood you to testify that those were the prices at which you sold previously imported merchandise, is that correct?—A. That is correct.

At the outset we think it proper to here set forth certain fundamental principles of law which have become well settled with respect to the construction and application of the provisions of said United States statutory value definition.

It is observed that the value is based upon "such or similar imported merchandise" which is "freely offered for sale, \* \* \* at the time of exportation of the imported merchandise." Since the controversy here rests largely on the showing in the instant record as to whether or not the time of the importation of similar merchandise into this country was sufficiently near the time of exportation of the instant merchandise it will be necessary for us later herein to refer to the record showing as to such importations of "such or similar" machines relied upon by the importer.

It is further noted that the so-called "prototype" merchandise does not have to be "such" (that is, identical) merchandise but may be "similar imported merchandise." Similar merchandise, of course, must be such as to properly reflect the true value of the imported merchandise being appraised. If the value of the imported merchandise can be ascertained by the appraiser from the value of similar merchandise, this is regarded, under the statute, as sufficient. This

particular question is somewhat important in deciding the instant issue.

Congress, in providing in section 402 the character of values to be accepted as the value of imported merchandise and setting out and defining the same, first preferred the foreign value or the export value, whichever was the higher. In the absence of such value the United States value was regarded as of next importance. If none of these three values was ascertainable the appraiser was remitted to an ascertainment of the cost of production. In addition to these provisions there was provided in the statute a requirement, under certain circumstances, to accept the American selling price of the imported article as the proper dutiable value, which American selling price was also defined in said section 402.

As the issue is presented here, we are concerned with no value except the proper United States value (as found by the trial judge) if one has been proved by the importer.

The parties hereto are agreed that if the record discloses that the offers of sales, made prior to the instant importations, of so-called "prototype" merchandise, were on dates and under such circumstances as to properly reflect the value of the instant merchandise such offers should be accepted as the basis for the value to be ascertained regardless of the fact that they were not made on the exact date of the exportation of the instant merchandise.

During the period while tariff act provisions relating to United States value have been in effect there has been much controversy concerning many circumstances involving the so-called "prototype" imported merchandise and also concerning the *time of exportation* from the foreign country of the merchandise under appraisal. In recent years it has become well settled, and the Government does not seriously contend here to the contrary, that the term, "at the time of exportation," must be given a broad and liberal interpretation so as to carry out the intent of Congress and that the term shall not be construed as meaning the *exact date of exportation*.

As before stated, it is well understood that while Congress preferred the application of the defined foreign or export values, it next preferred United States value in preference to cost of production. The United States value is more easily ascertained than the cost of production. Sometimes this has been especially true on account of the unavailability of information abroad with respect to the cost of producing the imported article. These considerations, in the past and now, have been and are influential in prompting this court to liberally construe the language of said United States value provision so as to bring about the obvious purpose of Congress and so as to make the provision workable in reflecting a fair value for appraisement. It seems clear that if the exact date of the exportation of imported merchandise were required to be applied the United States value provi-

sion would rarely be resorted to and thus the manifest intent of Congress would miscarry.

Therefore, it has now become the settled rule that in construing the term "at the time of exportation," it should not be held that the exact date is required but only that, prior to the exportation of the merchandise being valued, there had been at least one offer of sale of imported prototype merchandise under conditions which would truly reflect the United States value of the merchandise under appraisal.

This question has been considered by this court on numerous occasions. Our latest expression on the subject was the decision in *United States* v. *New York Merchandise Co., Inc.*, 31 C. C. P. A. (Customs) 213, C. A. D. 274. In that case, we think, the same issue as that at bar was clearly presented. While this court there held that the time at which and the circumstances under which the alleged prototype merchandise was sold and ready for delivery were not such as to properly reflect the statutory United States value (agreeable to the holding of the appellate division below) and therefore that the cost of production should be resorted to, certain fundamental rules in arriving at this conclusion were set forth in language pertinent to the issues therein involved, which language we think apropos and proper to quote here:

The law upon the construction of section 402 (e), *supra*, is, we think, fairly well settled, and without quoting extensively from the foregoing cited cases [the said citations were as follows: *The Stern Hat Co.* v. *United States*, 26 C. C. P. A. (Customs) 410, C. A. D. 48; *United States* v. *G. W. Sheldon & Co.*, 23 C. C. P. A. (Customs) 245, T. D. 48108; and *United States* v. *Collin & Gissel*, 29 C. C. P. A. (Customs) 96, C. A. D. 176], we think the following principles applicable to United States value are definitely settled: First, the value of the imported merchandise to be arrived at must be based upon the price at which such or similar *previously imported* merchandise is freely offered for sale to all purchasers, packed ready for delivery, etc., at the time of exportation of the imported merchandise. Second, the phrase "at the time of exportation" does not necessarily mean the hour or the day of exportation, *but a time near enough to the date of exportation and under such circumstances as will reflect the price of the goods on the date of exportation.* It is obvious that no definite period prior or subsequent to the exportation can be fixed as a standard for all cases. A fluctuating market, which might be brought about by many reasons, might make a date of sale or offer in this country prior or subsequent to the date of exportation an improper one to accept in determining the question here involved. On the other hand, the proof might show a steady, unvarying market or other conditions which would make a date months removed from the date of exportation a proper one to reflect what the price was on the date of exportation. [Last italics added here.]

In considering the importance of arriving at the right conclusion in the instant case on the decision of this important and sharply controverted question, we think it not improper to say, and it has been elsewhere often said, that in arriving at United States value or the cost of production under the act of 1930 of [sic] other acts similar in character, we must take into consideration the fact that Congress was trying, by including certain items and excluding others, to arrive at what might be comparable to a foreign value or an export value if there had been one,

and that Congress sought to apply as a settled tariff policy the foreign or export value whenever it was applicable, in preference to the United States value, which was obviously a less satisfactory basis for arriving at the final appraised value. Under such circumstances, in arriving at a determination as to whether United States value has been shown, it should clearly appear from the record that the facts fully warrant its application.

\* \* \* \* \* \*

As we interpret the decision of the said appellate tribunal [of the United States Customs Court], it did not intend to hold that *on the exact date of exportation* of the merchandise at bar it was necessary for the record to show that the importer *had made sales or offers for sale or had for sale such or similar merchandise*, although excerpts from the opinion \* \* \* might, where the exact language of the statute—"at the time of exportation"—is used, if narrowly construed, be interpreted to the contrary. [Last italics added here.]

In that case the Government argued somewhat to the opposite effect of its argument here. It urged strenuously there, when it was contending for United States value, that "at the time of exportation" did not mean the exact day of exportation but supported the position of the reappraising judge that it is sufficient, with respect to dates, if the sales or offers for sale of previously imported merchandise were made "at or near the time of exportation."

In the light of the principles laid down in the foregoing decision and what we have previously said herein, in determining the sole issue presented, we must now ascertain whether or not the importer has produced substantial evidence of sales or offers for sale, as prescribed by the statute, at such prices and under such circumstances as would properly reflect the value of the imported merchandise which is involved in the instant appeal. It would serve no useful purpose to unnecessarily extend this opinion by referring to the many different sales and offers covering a period of several years during which merchandise identical to that involved here has been imported into the United States and sold. It was stated in argument that many importations of the importer at bar were appraised at United States value because it happened, at the time of such importation, that the sale or offer for sale of the prototype article coincided exactly with the date of exportation of the article then under appraisal.

In the instant case obviously the appraiser, contrary to the views of the tribunals below, thought that prior importations of identical or similar articles were sold or offered for sale at times too remote from the time of the exportation of the instant merchandise.

The record clearly discloses that for a number of years prior to the time of exportation of the instant merchandise, and thereafter, the sale in this country of imported footers and leggers, identical in structure and price with those at bar, was a continuing business. The record discloses that such machines were in great demand and that they were being produced and exported on dates when, by virtue of filling domestic orders, there was at times no exact prototype ma-

chine on hand in this country ready for delivery. The similar machine, in some instances, may have been in the German warehouse, paid for and ready for shipment when requested by appellee. The record shows, and all parties agree, that the price at which the articles were sold to appellee and by appellee to its customers never varied. It appears from the record that the hosiery industry in the United States was chiefly concentrated in Philadelphia and North Carolina and that the salesmen of appellee regularly visited this territory and that goods identical to those at bar were continuously offered for sale both in the field and at the home office at Weehawken, N. J. There was no fluctuation of the price of the machines; it never changed during the entire period covered by the proof in the instant record. This fact is the most important and outstanding feature disclosed by the instant record.

It is made clear by the record that a 24 section footer and a 28 section footer, when made in the same gauge, differed only in that the 28 section machine made 28 articles while a 24 section machine made but 24. The difference in price between machines of different sections and different gauges was well understood by everyone concerned. It is agreed, however, that the value of a legger could not properly be determined from the value of a footer. In view of the record, we think this fact is immaterial since it is clearly shown that identical imported machines, and certainly those which were similar, were often imported at times near enough to the time of exportation of the instant machines to reflect the true statutory United States value of the latter.

The importer in its brief states:

While the lower court based its decision on the ground that it was not necessary that a prototype machine should be available on the *exact* date of the exportation of the machine under appraisement, following the ruling of this court in the *New York Merchandise Co.* case, nevertheless it should be pointed out that even on the theory that a prototype machine should be available on approximately the exact date of exportation, the record discloses that as to one of the shipments in question there was such a prototype machine available eighteen days prior to date of exportation, of the identical character of that under appraisement; as to another of the shipments there was an exact "prototype", available within one month and four days after the exact date of exportation, and as to the third shipment, there was a machine available for delivery on the exact date of exportation identical in every respect except that it was a 28 gauge instead of a 24 gauge. [Italics quoted.]

Appellee cites different shipments as disclosed by the special customs agent's report, admitted in evidence. This report shows that various machines, either identical or similar, were imported from Germany within a period ranging from eighteen days back to several months prior to the date of exportation of the instant merchandise. The Government criticises some of these alleged prototype importations relied upon by the importer but to some of them makes no criticism.

Attention is called to the fact that certain importations were made after the date of exportation of the merchandise here under consideration or that the offers of sale were made subsequent to such date. The appellate division pointed to certain language in the *New York Merchandise Co.* case, above quoted, and stated that:

While this statement indicates that sales subsequent to the date of exportation may be considered where they reflect the price of the goods on that date, we do not think it implies that the sales price of *subsequently imported* merchandise may be used as a basis for finding United States value. This is borne out by the fact that the claimed prototype in that case was merchandise previously imported and held in warehouse on the date of exportation of the involved merchandise.

Therefore, the sales of subsequently imported machines in reappraisement No. 152293–A and reappraisement No. 152294–A cannot be considered as establishing United States value, although they may be helpful in determining whether or not a steady market existed. [Italics quoted.]

The holding of the court there was entirely proper and such subsequent sales or offers are of value in this case only in showing a steady, unvarying market.

It seems that on certain occasions there was no exact prototype machine on hand, ready for delivery, on the exact date of exportation of part of the instant merchandise, but unquestionably such prototype machine had previously been delivered or would be delivered in the immediate future. In other words, as stated before, there was a constant series of commercial transactions which did not vary or fluctuate in either price or character of machine, and we think it immaterial that on the exact date of exportation, under the circumstances heretofore stated, there was no exact prototype machine on hand in this country.

We are brought to our conclusion in this case without hesitancy because the record produces the unquestioned conviction that the sales or offers for sale of prototype machines were at such times and under such circumstances as to properly and truly reflect the exact United States value of the instant merchandise. As stated in the *New York Merchandise Co.* case, *supra,* fluctuations in price might require a holding that a date of importation and sale of prototype merchandise would be too remote to be accepted in arriving at the value of the merchandise being appraised, but here there is a positive showing of a constant, continuous, unfluctuating market, at the price arrived at by the trial judge, of articles such as or similar to those here involved.

If, upon the instant record, we were to arrive at any other conclusion it would necessarily result in some instances of identical merchandise, sold at uniform prices, being valued, for tariff purposes, differently from other like importations.

We think the tribunals below arrived at the proper conclusion when

it was held, in well written and well considered decisions, that the importer had properly proved an acceptable United States value.

Concerning our prior decision in *United States* v. *Collin & Gissel* (*Ludwig Baer*), 29 C. C. P. A. (Customs) 96, C. A. D. 176, the single reappraising judge quoted the following language therefrom:

[Where the proof showed that there was] no prototype machine in the United States *at or near the date of exportation* of the involved machine available for offer, a fundamental element of United States value, as defined by the statute, was lacking. * * * [Italics supplied.]

and then stated:

But I am of the opinion that the foregoing statement must be viewed in the light of the facts in that case. It there appeared that there had been continuous offers and sales of identical merchandise prior to the date of exportation of the goods being valued, but that there had been a *price change* shortly before such date. Obviously, therefore, the price at which the machines were being freely offered and sold prior to such price change would be valueless as evidence of the price of the machines there under consideration. No merchandise which had been imported prior to the said date of exportation *had been freely offered for sale or sold at the new price*. As a matter of fact, the involved shipment was the first importation to arrive after the price change, and hence there was no prototype merchandise at the new price. It was, in effect, a first importation. [Italics quoted.]

By contrast, in the case at bar the evidence is clear that the price for each type of machine was uniform over a period of years prior to the date of exportation. The situation presented is akin to that postulated by the Court of Customs and Patent Appeals in the case of *United States* v. *New York Merchandise Co., Inc.,* * * *

Here follows the quoted language from said *New York Merchandise Co.* case hereinbefore set out. The trial judge continued:

I regard the language which I have emphasized as embodying a wholesome doctrine. As I interpret the views expressed by the court they reflect its purpose to liberalize rather than to restrict or narrow the scope of the United States value provision. In so doing the practical administration of the provision is promoted, and the application of United States value—a highly desirable alternative method of ascertaining a constructive foreign market value—is given an appropriate, legal, and practical construction. In according United States value in section 402 (e), *supra*, precedence over statutory cost of production in section 402 (f), *supra*, Congress doubtless recognized the greater facilities afforded for its ascertainment by administrative officials, and also that it was readily available through legal processes in this court. In the absence of foreign or export value, it would seem, therefore, to be a salutary means of appraising imported merchandise which should be jealously guarded and adopted wherever legally applicable.

The trial judge and the appellate division from whose judgment this appeal is taken arrived, we think, at the right conclusion for the proper reasons stated. We think the record fully justifies the conclusion reached by the tribunals below. Certainly it cannot be said that there is no substantial evidence afforded by the record supporting the judgment, and the judgment appealed from is *affirmed*.