VAN GELDER-FANTO CORP. v. UNITED STATES (No. 4744)[1]

[1] C. A. D. 534.

United States Court of Customs and Patent Appeals, June 17, 1953

*Eugene R. Pickrell, Esq.* (*Eugene R. Pickrell* and *Michael Stramiello, Jr.*, of counsel) for appellant.

*Charles J. Wagner*, Acting Assistant Attorney General (*Richard E. FitzGibbon,* special attorney, of counsel), for the United States.

[Oral argument April 17, 1953, by Mr. Pickrell and Mr. FitzGibbon]

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and JACKSON (retired), Associate Judges

JACKSON, Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, First Division, pursuant to its decision, C. D. 1417, 28 Cust. Ct. 249, overruling a protest by appellant and holding that the involved merchandise, cholesterol, was properly dutiable as classified by the Collector of Customs at New York as a chemical compound under paragraph 5 of the Tariff Act of 1930, at the rate of 25 per centum ad valorem.

In the protest it was claimed that the imported merchandise was properly dutiable under paragraph 34 of the Tariff Act of 1930 at 10 per centum ad valorem as a drug, advanced in value or condition. (Duty reduced to 5 per centum ad valorem under T. D. 51802.)

The competing paragraphs read as follows:

Par. 5.  * * * and all chemical salts and compounds * * * not specially provided for, * * * 25 per centum ad valorem.

Par. 34. Drugs, such as barks, beans, berries, buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, herbs, leaves, lichens, mosses, roots, stems, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and all other drugs of vegetables or animal origin; any of the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, but which are advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, 10 per centum ad valorem; *Provided*, that the term "drug" wherever used in this Act shall include only those substances having therapeutic or medicinal properties and chiefly used for medicinal purposes: *And provided further*, that no article containing alcohol shall be classified for duty under this paragraph. (Duty reduced to 5 per centum ad valorem under T. D. 51802.)

The Customs Court, in its decision, held that the proof adduced on behalf of appellant was not sufficient to sustain its claim in that no showing had been made that cholesterol possessed any medicinal or therapeutic properties by itself nor was it chiefly used for medicinal purposes because of its therapeutic properties.

It appears that cholesterol is a natural product generated in animal organisms and extracted from brains and the spinal cords of animals and likewise obtained from wool grease. It is an uncompounded substance and contains no alcohol. It is said that the substance occurs in many food products and, while by itself it may be taken without deleterious results, it is not eaten as a food and has no food value.

The trial court, in its reasoning concerning the expression "not edible," cited the case of *United States* v. *Yick Shew Tong Co.*, 25 C. C. P. A. (Customs) 255, T. D. 49392.

The issue here, as below, is whether the imported merchandise possesses therapeutic or medicinal properties and is chiefly used for medicinal purposes. It is obvious that both of those conditions are essential for the classification as a drug under the paragraph claimed.

The chief chemist of the Ciba Pharmaceutical Products, Inc. purchased the involved cholesterol. He arranged for its procurement, observed it on arrival, and had it analyzed pursuant to the procedure outlined in the United States Pharmacopoeia and found that the specifications and quality for cholesterol as therein set forth, were fully met.

The witness, from his experience which included supervision over the production of his company, stated that it had used approximately 60 tons of the merchandise and that "the main use, as I know it, is for hormone manufacture." The hormones in which the imported goods were used are such as testosterone, methyl testosterone, anhydrohydroxprogesterone, testosterone propionate. The witness stated

that cholesterol has a minor use in making various medicinal ointments and creams.

Because the witness did not testify as to the properties of or the purpose for which cholesterol was used, the trial court held that such omission adversely affected appellant's claim.

Another witness, who was a well qualified doctor of pharmacy and also possessing a degree in chemistry, and who was employed as a pharmacist either in Germany or Holland, first as a pharmacist and then as an analytic chemist, testified that he had been employed as a research chemist and production manager for the Duke Laboratories at Stamford, Conn., which manufactured ointments, cosmetics and ointment bases. With respect to the use of cholesterol, he stated, "we are using it in manufacturing [sic] of wool wax, containing cholesterol." From his testimony it appears that the Duke Laboratories do not use cholesterol by itself but use wool wax alcohols containing cholesterol as an ingredient.

Therefore, it is obvious that the testimony of the witness did not tend to show therapeutic or medicinal properties and medicinal use of the goods.

Another licensed pharmacist appeared for appellant who stated that he had been engaged in "manufacturing pharmaceutical specialties which are sold to other pharmacists, which in turn are dispensed on physicians' prescriptions." The gist of his testimony is that he used the involved substance in filling physicians' prescriptions, mainly those written by dermatologists. No attempt was made by him to give testimony concerning any therapeutic properties or medicinal use of cholesterol. The trial court stated that his training would not qualify him to do so.

A dermatologist also testified for appellant. He stated that cholesterol was included as part of prescriptions he wrote in remedies for skin diseases, particularly acute dermatitis, in its various types and stages. He stated that cholesterol is never prescribed for use by itself but appears to be an ingredient in preparations having a petrolatum base to which water is added. He said that the effect of using cholesterol in such connection was entirely physical and that it brings a lubricating effect to petrolatum and that the water in oil has an alleviating effect on diseased skin conditions. From his testimony it appears that the imported goods are really a carrier used for the purpose of emulsifying or bringing the water and oil into usable condition.

Such testimony was properly held by the trial court merely to indicate the physical properties of cholesterol rather than proof of therapeutic or medicinal qualities.

A mechanotherapist testified for appellant. He stated that his art or science consists of "the study of the handling of diseases which comprise such things as rheumatism, bursitis, arthritis, and makes

use of the means of hydrotherapy, ultra-violet, medical massage, and manipulation." With respect to cholesterol his testimony was merely to experimental work which he performed on monkeys. In such experiments he was attempting to inactivate or neutralize the polio-myelitis virus by means of cholesterol.

Such testimony was said by the trial court, and properly we think, not to be "even remotely associated with the use of the commodity for practical commercial purposes."

The definitions cited by counsel for appellant from Webster's and Funk and Wagnalls dictionaries of the terms "therapeutic" and "medicinal" are correct. However, in our opinion, the terms of those definitions clearly contemplate material having therapeutic or medic-inal qualities to be used in the cure or treatment of bodily disorders..

It is contended by counsel for appellant that the court erred in refusing to admit certain testimony by the research chemist of the Duke Laboratories. The witness was asked if he had ever used a substance under the trade name of "Aquaphor." He stated that he had used it personally upon himself and when asked for what purpose he used it, the objection to the answer was sustained. In our opinion such ruling was correct. Under proper questioning the answer sought for with respect to the entire contents of the substance and the effect of having cholesterol therein could have easily been brought out.

It is stated that Aquaphor contains 2½ per cent of cholesterol. Nothing is said as to what the remaining 97½ per cent is and, there-fore, it may, and probably is, the case that the cholesterol used in Aquaphor was for the physical purpose of emulsifying.

In their brief, counsel for appellant quote from various chemical and pharmaceutical publications which are stated to be recognized authorities. We will not go so far as to agree with the argument advanced by counsel for appellee that the only legitimate use of such books is in cross-examination to show that the witness disagrees with statements contained therein.

It is trite to say that it is the province of the court to take judicial notice, not only of things that are of common knowledge, but also of authoritative publications. However, an examination of the quota-tions from those publications sheds no light upon the question of whether the imported merchandise has therapeutic or medicinal properties or whether it is chiefly used for medicinal purposes.

We find no error in the action of the court below and the judgment is therefore *affirmed*.

Cole, J., having disqualified himself, Jackson, J., retired, was re-called to participate herein.