Slip Op. 01 - 111

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| | : | |
| VWP OF AMERICA, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **Before: MUSGRAVE, JUDGE** |
| | : | |
| THE UNITED STATES, | : | Court No. 93-12-00803 |
| | : | |
| Defendant. | : | |
| | : | |

[Matter remanded to the U.S. Customs Service for consideration of transaction, deductive, and computed values, as appropriate, of certain fabrics imported from Canada.]

Dated: August 29, 2001

*Barnes, Richardson & Colburn* (*James S. O'Kelly* and *Alan Goggins*), New York City, for the plaintiff.

*Stuart E. Schiffer*, Acting Assistant Attorney General; *Joseph I. Liebman*, Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice, (*Saul Davis*), for the defendant.

## OPINION

Familiarity with prior decisions is presumed. Briefly, the matter concerns the proper valuation of 34 shipments of woolen "melton,"[1] stripes, plaids, and tweeds entered for consumption between November 17, 1992 and February 1, 1993 by plaintiff Victor Woollen Products of America, Inc. ("VWPA") from its parent and the manufacturer of the fabrics, Les Lainages Victor Ltée (a/k/a

---

[1] "Melton" is "fabric with all[ ]wool or cotton warp and woolen weft; the face is napped carefully to raise the nap straight up, showing the weave clearly. Also known as beaver cloth; kersey." *McGraw-Hill Dictionary of Scientific and Technical Terms* 1171 (4th ed. 1989). The melton at issue is primarily of wool and nylon with a smooth finish and was intended for use mainly as wool bodies in high school varsity jackets.

Victor Woollen Products, Ltd.), of St. Victor de Beauce, Quebec, Canada ("VWPC").[2] The fabrics were classified by the United States Customs Service ("Customs") under Item 5111.30.9000 of the Harmonized Tariff Schedules of the United States, and dutied at 38 percent *ad valorem* plus 22 cents per pound. *VWP of America, Inc. v. United States*, 21 CIT 1109, 980 F. Supp. 1280 (1997) found VWPC and VWPA, as a matter of fact, to be one and the same for customs duty purposes and ruled in favor of the defendant. The Court of Appeals for the Federal Circuit ("CAFC") disagreed, finding that the VWPC-VWPA transactions were sales "for exportation" to the United States which "may serve as the basis for transaction value" if such sales "satisfy the requirements of 19 U.S.C. § 1401a(b)(1)" and provided that "the acceptability of the transaction value arising from such sales is established under 19 U.S.C. § 1401a(b)(2)(B)." *VWP of America, Inc. v. United States*, 175 F.3d 1327, 1338 (Fed. Cir. 1999). Toward that end, the matter has been remanded for: (i) consideration of whether certain costs and expenses must be included in the declared transaction values pursuant to § (b)(1) or § (b)(4)(A) of 19 U.S.C. § 1401a, (ii) comparing the VWPC-VWPA transactions against the Cookshiretex sales in accordance with 19 U.S.C. § 1401a(b)(2)(B)(i) (the transaction values established by the Customs with regard to the Cookshiretex sales being presumed correct by virtue of 28 U.S.C. § 2639(a)(1)), and (iii) as necessary, *de novo* review of the plaintiff's deductive and computed values under 19 U.S.C. § 1401a (d) and (e), respectively. *Id*. at 1343. The matter will be remanded to Customs for further proceedings in accordance with this opinion.

---

[2]  VWPA and VWPC herein collectively "Victor Woollen Products."

*Discussion*

Under the Trade Agreements Act of 1979, Pub. L. 96-39, Title II, § 201(a), 93 Stat. 194 (July 26, 1979), as amended by Pub. L. 96-490 § 2, 94 Stat. 2556 (Dec. 2, 1980) ("TAA"), Customs is required to value imported merchandise in order of: (1) the transaction value of the imported merchandise, (2) the transaction value of identical merchandise, (3) the transaction value of similar merchandise, (4) the deductive or, if timely requested, computed value of the imported merchandise, or (5) upon the basis of a method derived from one of the foregoing, "reasonably adjusted to the extent necessary to arrive at a value," subject to certain exceptions. 19 U.S.C. §§ 1401a(a) and 1401a(g). 19 U.S.C. § 1401(a)(b)(1) defines "transaction value of imported merchandise" as "the price actually paid or payable for the merchandise when sold for exportation to the United States" plus

> (A)   the packing costs incurred by the buyer with respect to the imported merchandise;
>
> (B)   any selling commission incurred by the buyer with respect to the imported merchandise;
>
> (C)   the value, apportioned as appropriate, of any assist;
>
> (D)   any royalty or license fee related to the imported merchandise that the buyer is required to pay, directly or indirectly, as a condition of the sale of the imported merchandise for exportation to the United States;  and
>
> (E)   the proceeds of any subsequent resale, disposal, or use of the imported merchandise that accrue, directly or indirectly, to the seller.

19 U.S.C. § 1401(a)(b)(1). The "price actually paid or payable" for imported merchandise

> shall be increased by the amounts attributable to the items (and no others) described in subparagraphs (A) through (E) only to the extent that each such amount (i) is not otherwise included within the price actually paid or payable;

and (ii) is based on sufficient information. If sufficient information is not available, for any reason, with respect to any amount referred to in the preceding sentence, the transaction value of the imported merchandise concerned shall be treated, for purposes of this section, as one that cannot be determined.

*Id.* "Sufficient information" is such information that "establishes the accuracy" of, *inter alia*, the above amounts. 19 U.S.C. § 1401(a)(h)(2). The "price actually paid or payable" is defined as

the total payment (whether direct or indirect, and exclusive of any costs, charges, or expenses incurred for transportation, insurance, and related services incident to the international shipment of the merchandise from the country of exportation to the place of importation in the United States) made, or to be made, for imported merchandise by the buyer to, or for the benefit of, the seller.

19 U.S.C. § 1401a(b)(4)(A).

In addition, under 19 U.S.C. § 1401a(b)(2)(A)(iv) transaction value is to be used "only if" the buyer and seller are unrelated or, if they are related, their transaction value is considered "acceptable." A related party transaction is "acceptable" as transaction value

if an examination of the circumstances of the sale of the imported merchandise indicates that the relationship between such buyer and seller did not influence the price actually paid or payable; or if the transaction value of the imported merchandise closely approximates—

(i) the transaction value of identical merchandise, or of similar merchandise, in sales to unrelated buyers in the United States; or

(ii) the deductive value or computed value for identical merchandise or similar merchandise;

but only if each value referred to in clause (i) or (ii) that is used for comparison relates to merchandise that was exported to the United States at or about the same time as the imported merchandise.

19 U.S.C. § 1401a(b)(2)(B).  Values used for comparison must take into account, "based on sufficient information whether supplied by the buyer or otherwise available to the customs officer concerned," differences in commercial levels, quantity levels, the "costs, commissions, values, fees, and proceeds" described in 19 U.S.C. § 1401a(b)(1)(A)-(E), and any cost differences in unrelated sales by the seller (if such are used as a basis for comparison).  19 U.S.C. § 1401a(b)(2)(C).

"Deductive" value is defined as the resale price of imported merchandise in the United States less amounts associated with general expenses and profits, transportation, customs clearance, and customs duties and certain fees.  19 U.S.C. § 1401a(d).  Deductive value requires consideration of "the unit price at which the merchandise is sold in the greatest aggregate quantity at or about" the date of importation. 19 U.S.C. § 1401a(d)(2)(A). The "greatest aggregate quantity" unit price is "the unit price at which such merchandise is sold to unrelated persons, at the first commercial level after importation . . . in a total volume that is (i) greater than the total volume sold at any other unit price, and (ii) sufficient to establish the unit price."  19 U.S.C. § 1401a(d)(2)(B).  This price is then reduced by (i) "any commission usually paid or agreed to be paid, or the addition usually made for profit and general expenses" in connection with U.S. sales of imported merchandise "of the same class or kind . . . as the merchandise concerned"; (ii) the costs of transporting and insuring the international shipment of the merchandise; (iii) the costs of transporting and insuring from the U.S. border to the place of delivery (if not already excluded by (i)); and (iv) customs duties and Federal taxes payable on the merchandise by reason of its importation.  19 U.S.C. § 1401a(d)(3)(A)(i)-(iv).  In addition,

> profits and general expenses shall be based upon the importer's profits and general expenses, unless such profits and general expenses are inconsistent with those reflected in sales in the United States of imported merchandise of the same class or kind, in which case the deduction shall be based on the

usual profit and general expenses reflected in such sales, as determined from sufficient information.

19 U.S.C. § 1401a(d)(3)(B). Finally, if not already included, any packing costs incurred by the importer or U.S. buyer must be added to such figure. 19 U.S.C. § 1401a(d)(3)(C).

By contrast, "computed" value is defined as the sum of

(A) the cost or value of the materials and the fabrication and other processing of any kind employed in the production of the imported merchandise;

(B) an amount for profit and expenses equal to that usually reflected in sales of merchandise of the same class or kind as the imported merchandise that are made by the producers in the country of exportation for export to the United States;

(C) any assist, if its value is not included under subparagraph (A) or (B); and

(D) the packing costs.

19 U.S.C. § 1401a(e)(1). Furthermore, as with deductive value,

the amount for profit and general expenses . . . shall be based upon the producer's profits and expenses, unless the producer's profits and expenses are inconsistent with those usually reflected in sales of merchandise of the same class or kind as the imported merchandise that are made by producers in the country of exportation for export to the United States, in which case the amount . . . shall be based on the usual profit and general expenses of such producers in such sales, as determined from sufficient information.

19 U.S.C. § 1401a(e)(2)(B).

## I

Before comparing the transfer prices between VWPC and VWPA against test values to determine their acceptability as transaction values, it is necessary to consider whether the expense of operating VWPA and the selling commissions paid to Concept III ("Concept") for U.S.

representation are to be considered additions to or a part of the price paid for the VWPC-VWPA

transactions. That necessitates, once again, examination of the commercial relationship involved.

The "charge back" expenses and the commissions paid to Concept are addressed separately.

## A

The "charge back" expenses included customer and clerical services (communication and

telephone expenses, office rent, stationary, and accounts receivable insurance), management fees,

and data processing. The plaintiff asserts that VWPA's financial statements, audited by an

internationally recognized accounting firm, establish that these expenses were billed monthly[3] by

VWPC to VWPA and paid separately from the invoices for the imported fabrics. The plaintiff

argues that there should be no legitimate dispute as to the "nature" of the charges which it alleges

were recorded on the companies' books separately from transfer payments for the imported

merchandise. Plaintiff's Memorandum Addressing the Issues on Remand ("Pl.'s Br.") at 1, 5-7,

referencing Pl.'s Exs. 58, 60 and Trial Transcription ("Tr.") at 174, 272.

The five different categories of payments in 19 U.S.C. § 1401a(b)(1)(A)-(E) which must be

added to the "price actually paid or payable" to arrive at transaction value are packing costs, selling

ommissions, assists, royalties and license fees, and the "proceeds of any subsequent resale." The

plaintiff argues this was written in such a way as to exclude all other expenses: "[t]he price actually

paid or payable . . . shall be increased by the amounts attributable to the items (*and no others*)

described in subparagraphs (A) through (B)." Pl.'s Br. at 9 (Plaintiff's highlighting). The plaintiff

---

[3] There was no documentation submitted into evidence of payments from VWPA to VWPC except for Pl.'s Ex. 60, which provides a yearly total of such payments.

contends that none of the "charge backs" in issue fit within the categories delineated and that the

"official" published position of Customs is that a

> separate fee paid to a related party seller for the following services is not part
> of the price actually paid or payable since the fee is unrelated to the
> manufacture of the imported merchandise: management services, accounting,
> finance, planning, and clerical activities.

Pl.'s Br. at 10, quoting *Encyclopedia of Customs Valuation Terminology* 101 (1996) summarizing

HQ 543512 (Apr. 9, 1985).  The plaintiff asserts that Customs has been "consistent" in this position

from enactment of the transaction value statute in 1979 to the present.  Pl.'s Br. at 10, referencing

HQ 542122 (Sep. 1, 1980), C.S.D. 81-64, 15 Cust. B. & Dec. 862 (1981), and HQ 545420 (May 31,

1995).

The government disagrees, arguing that the expenses in issue are part of "the total payment

. . . made . . . for imported merchandise by the buyer to, or for the benefit of, the seller," 19 U.S.C.

§ 1401a(b)(4)(A), and/or must be added to transaction value in accordance with one or more

provisions of 19 U.S.C. § 1401a(b)(1)(A)-(E).  Def.'s Br. at 21-25.  For support, the government

refers to *Nissho Iwai American Corp. v. United States*, 16 CIT 86, 94, 786 F. Supp. 1002, 1010

(1992), *rev'd on other grounds*, 982 F.2d 505, 512 (1992), *Generra Sportswear Co. v. United States*,

905 F.3d 377, 380-381 (Fed. Cir. 1990), and  *Moss Manufacturing Co. v. United States*, 896 F.2d

535, 539 (Fed. Cir. 1990).[4]  The government emphasizes that the common thread of these cases is

---

[4]  In *Nissho Iwai*, a claimed deduction from transaction value for accounts receivable
insurance, paid by the U.S. subsidiary-importer, was disallowed on the ground that it  protected the
importer from breach of contract by the U.S. buyer, not from loss of goods in international transit.
16 CIT at 94, 786 F. Supp. at 1010 (1992).  *See* 19 U.S.C. § 1401a(b)(4).  In *Generra*, Customs'
regard of export quota charges as payment "for imported merchandise" was considered "permissible
construction" of 19 U.S.C. § 1401a(b).    905 F.3d at 379-380.  In *Moss,* an amount paid to an
(continued...)

that payments were included in transaction value because they accrued directly or indirectly to the

seller by reason of the manufacture *or sale* of imported merchandise.  Def.'s Br. at 21-22.

    *Nissho Iwai* mandated customs duty on accounts receivable insurance paid by the U.S.

importer which had not been included as a part of the "first tier" transaction with the related-party

seller.  16 CIT at 94.  The government contends that *Nissho Iwai* is in accordance with the statutory

definition of "price actually paid or payable," 19 U.S.C. § 1401a(b)(4), because the insurance

payments therein were part of the "total payment" paid by the buyer for the merchandise and accrued

directly or indirectly to the seller, and it argues that the situation here is analogous.  Def.'s Br. at 21.

Similarly, the government characterizes *Generra* as requiring additions to transaction value of

payments which were made by the buyer to the seller independently of the invoiced price of the

goods where such payments are not specifically excluded from transaction value by statute.  *Id.* at

22, referencing 905 F.2d at 380.[5]

---

[4](...continued)
importer's overseas buying agent, who "assisted in bringing about the sale," was considered part of
the payment "for goods."  896 F.2d at 538-539.

    [5] The government contends that *Generra* necessarily distinguished *McAfee v. United States*,
842 F.2d 314 (Fed. Cir. 1988) because *McAfee* had relied on *United States v. Getz Bros. & Co.*, 55
CCPA 11 (1967), which in turn had been decided under "export value," the statutory predecessor
of "transaction value."  According to the government, "export value" had not permitted the addition
of quota charges "because they were not part of the objective standard of export value," however it
argues that Congress intended "transaction value" to encompass quota charges as part of "the price
actually paid or payable."  The government also states that "*Generra* was careful to note that this
holding did not effect *Getz*'s requirement of the use of a valid first level sale rather than a second
level sale.  Rather, even if one uses a first level sale under *McAfee* and *Nissho*, there are certain
mandatory additions to the price that must be made in order to arrive at a proper [transaction value
("tv")], whether it is the tv for the merchandise in issue or the tv that must be used for comparison
purposes in related party transactions."  Def.'s Br. at 22.

The plaintiff asserted on appeal that the charges here at issue had "nothing to do with the import transactions, but were simply general overhead expenses arising from services provided by VWPC and properly charged to VWPA."[6]   It responds here that the government's brief "mischaracterizes administrative services subcontracted to VWP[C] by VWPA as having been for the benefit of VWP[C]" when "it is clear from the record these services were for the benefit of VWPA and their cost was properly recorded on VWPA's books as part of the cost of doing business." Pl.'s Rep. at 6-7. *See* Tr. at 378, 388. The plaintiff points out that *Chrysler Corp. v. United States*, 17 CIT 1049 (1993), relying on *Generra*, found that certain "shortfall" and "special application" fees paid by the buyer to the seller were determined not to constitute part of the price actually paid or payable under 19 U.S.C. § 1401a(b)(4)(A). The plaintiff contends that the *Chrysler* fees were independent and "unrelated to any specific merchandise" and that therefore they are similar to the expenses here in issue, whereas the "payments for quota fees in *Generra* were *necessary preconditions* to the exportation of the merchandise because without the requisite quota the merchandise could not be exported to the United States." *Id*. at 2. (italics added).

Whether a particular transaction provokes liability for customs duties depends upon its relevance to importation. *Generra* instructs that so "long as the . . . payment was made to the seller in exchange for merchandise sold for export to the United States, the payment properly may be included in transaction value, even if the payment represents something other than the *per se* value of the goods. The focus of transaction value is the actual transaction between the buyer and seller." 905 F.2d at 380. But, to state that a payment is dutiable if it is "in exchange for" imported

---

[6] *See* 175 F.3d at 1340 (citation omitted).

merchandise is to cut a wide swath. Consequently, Customs presumes that all payments made by a buyer to a seller are part of the price actually paid or payable for the imported merchandise, a presumption which may be rebutted by evidence which establishes that the payments are "completely unrelated" to the imported merchandise. *E.g.*, HQ 546638 (Oct. 4, 1999); HQ 545998 (Nov. 13, 1996), 1996 WL 910814 (1996). Nevertheless, the private ruling letters of Customs display varied and sometimes inconstant analyses on the dutiability of managerial and other "general" business expenses (*e.g.* arranging financing, accounting, administration, clerical activities, *et cetera*).

On the one hand, Customs has considered that managerial and/or general expenditures by a U.S. importer to its own agents acting on its behalf abroad[7], or for assistance with operations on United States soil by agents dispatched for the purpose by foreign related manufacturers or sellers,[8] are no longer dutiable "assists" under 19 U.S.C. § 1401a(b)(1)(C),[9] whereas charges for managerial

---

[7] *See*, *e.g.*, HQ 545420 (May 31, 1995); HQ 544421 (Apr. 3, 1990); HQ 544396 (May 14, 1990), C.S.D. 90-77, 24 Cust. B. & Dec. 495 (1990); HQ 543992 (Sep. 10, 1987); HQ 543820 (Dec. 26, 1986); HQ 542122 (Sep. 1, 1980), C.S.D. 81-64, 15 Cust. B. & Dec. 862 (1981). As generally articulated, "activities undertaken by a buyer on his own account, other than those for which an adjustment is provided [under 19 U.S.C. § 1401a(b)(1)], are not considered to be part of the price actually paid or payable, and payments for such services would not be added to the price actually paid or payable." HQ 544338 (Sep. 13, 1989).

[8] *See*, *e.g.*, HQ 543512, *supra*; HQ 054864 (Jan. 24, 1979), C.S.D. 79-280, 13 Cust. B. & Dec. 1405 (1979).

[9] An importer's assistance provided to the foreign manufacturer or seller was considered dutiable under prior law. *See, e.g.* HQ 651920 (Dec. 11, 1973). Under current law an "assist" includes any of the following if supplied free of charge or at reduced cost by the buyer, directly or indirectly, for use in connection with the production or the sale for export to the United States of the imported merchandise:

    (i)    materials, components, parts, and similar items incorporated in the imported merchandise;

(continued...)

and/or general expenses which are included in a price actually paid or payable for imported merchandise will not be deducted therefrom.[10] It has furthermore opined that in the absence of evidence of management fee payments between a U.S. importer and its related oversees exporter, there is no basis for including such payments in the appraised value of the imported merchandise.[11] On the other hand, Customs has apparently considered managerial or general payments to a related-party seller or exporter when commingled with purported payments for imported merchandise to implicate whether consideration passes from one entity to another, *i.e.*, whether the sale is *bona fide*.[12] And it has also considered that in the absence of evidence of a buying agency relationship between the importer and its offshore, related-party management-services contractor (unrelated to the overseas manufacturers from whom fabrics were procured), the procurement of "assists" and

---

[9](...continued)
    (ii)   tools, dies, molds, and similar items used in the production of the imported merchandise;

    (iii)   merchandise consumed in the production of the imported merchandise; and

    (iv)   engineering, development, artwork, design work, and plans and sketches that are undertaken elsewhere than in the United States and are necessary for the production of the imported merchandise.

19 U.S.C. § 1401a(h)(1). The value of an assist is to be apportioned in a "reasonable manner appropriate to the circumstances and in accordance with generally accepted accounting principles" and depending on documentation submitted by the importer. 19 C.F.R. § 152.103(e)(1) (1992).

[10] *E.g.* HQ 542122, 15 Cust. B. & Dec. at 864; HQ 545953 (Aug. 3, 1995).

[11] HQ 545522 (Apr. 26, 1995).

[12] *E.g.* HQ 545800 (June 28, 1996); HQ 543446 (Apr. 2, 1986); HQ 545571 (Apr. 28, 1995); HQ 543352 (June 11, 1984); HQ 542673 (June 10, 1982), C.S.D. 82-137, 16 Cust. B. & Dec. 946 (1982). *Cf. J.L. Wood v. United States*, 62 C.C.P.A. 25, 505 F.2d 1400 (1974).

inspection services, a function of managerial duties, would be dutiable.[13]  At a minimum, it would appear that the general interpretation of Customs is that characterization of an expense does not determine its dutiability, a position with which this Court would agree: the inquiry should focus on whether the expenditure proximately results in or is connected in some way to importation.  If importation is the proximate result of an expense, however characterized, the expense is dutiable. *See Generra*, *supra,* 905 F.2d at 380.  Conceptually, the economic "value" of merchandise in its state as imported would include all matters which accrue in advance and are incidental to placing it into the international stream of commerce.[14]  Thus, for example, in *Chrysler* the "shortfall"and "special application" payments were triggered by non-performance on a contract, not importation.  *See* 17 CIT at 1054.  In the absence of importation, such payments appear akin to penalties or liquidated damages, and are not analogous to the circumstances here, where the value of the fabrics in their state as imported would have included all matters which proceeded receipt by VWPC on behalf of VWPA of purchase orders from customers in the United States via Concept.  By contrast, subsection (E) of 19 U.S.C. § 1401a(b)(1) requires inclusion in transaction value of "the proceeds of any subsequent resale, disposal, or use of the imported merchandise that accrue, directly or indirectly,

---

[13]  HQ 545420 (May 31, 1995).  *Cf*. HQ 544423 (June 3, 1991); HQ 544976 (Mar. 17, 1993).

[14]  "[T]he sale price of a product is the total of all value added by each step of the production process to that point.  'The value added of a loaf of bread is the sum of the value contributed at each stage of the production and distribution process.  Among others, it includes the contribution of the farmer, miller, baker, wholesaler and retailer.'" *Trinova Corp. v. Michigan Dep't of Treasury*, 498 U.S. 358, 362 (1990) quoting Haughey, *The Economic Logic of the Single Business Tax*, 22 Wayne L. Rev. 1017, 1019 (1976).  *See generally id*. at 362-365.

to the seller."[15]  Obviously, all of VWPA's revenues were "proceeds" of the "subsequent resale, disposal, or use of the imported merchandise", some of which were remitted to VWPC for services rendered and fees expended in fulfilling VWPA's obligations to U.S. purchasers of Victor Woollen Product fabrics in advance of importation.  The Court considers such payments to fall within the ambit of "proceeds"[16] in accordance with the plain meaning of 19 U.S.C. § 1401(a)(b)(1)(E). Customs requires proceeds to be "directly related" to importation to be dutiable.  19 C.F.R. § 152.103(g) (1992).  It will therefore be instructed to include such proceeds as are appropriate for inclusion in the price actually paid or payable for the imported merchandise.

**B**

The government also contends that the dutiable transaction values of the merchandise in issue must also include the commissions which were paid to Concept.  As a general principle, fees paid to a true buying agent, who represents and is controlled by the importer, are not dutiable, while payments which assist the seller are dutiable.  *United States v. Bauer*, 3 Cust. Ct. Appl. 343, T.D. 32626 (1912).  *Compare*, *e.g.*, HQ 545465 (Apr. 6, 1994) *with* HQ 545362 (May 31. 1994).  There is no statutory exclusion for "buying commissions" in the TAA, however "transaction value"

---

[15] Subsection (E) is sweeping, however Customs does not impute to a seller the proceeds of resale, disposal or use accruing through stock ownership but requires a direct relationship of such proceeds to the imported merchandise.  *See* 19 C.F.R. § 152.103(g) (1992) ("[d]ividends or other payments from the buyer to the seller which do not relate directly to the imported merchandise will not be added to the price actually paid or payable").

[16] "Proceeds" are not merely "profits," they are "that which proceeds or results, as from a transaction; especially, the sum derived from a sale, venture," *et cetera*. *Webster's New Universal Unabridged Dictionary* 1434 (2d ed. 1983).  Examples include "issues; income; yield; receipts; produce; money or articles or other thing of value arising or obtained by the sale of property; the sum, amount, or value of property sold or converted into money or into other property." *Black's Law Dictionary* 1204 (6th ed. 1990).

specifically includes (if not otherwise included) "any selling commission incurred by the buyer with respect to the imported merchandise." 19 U.S.C. § 1401a(b)(1)(B). "Selling commission" is not defined in the TAA. Since there is no legislative history discussing the term either, Customs has relied on the common law of agency to determine whether an agency relationship exists, and whether commissions paid to an agent are "selling commissions." *See Dutiability of "Royalty" Payments*, 1993 WL 500065 (Jan 21, 1993).

By regulation, "selling commission" is defined as "any commission paid to the seller's agent, who is related to or controlled by, or works for or on behalf of, the manufacturer or the seller." 19 C.F.R. § 152.102(b) (1992). Commissions paid to Concept for assistance with VWPC's direct sales to the U.S. apparently would have been dutiable prior to November 1989 under transaction valuation. After November 1989, Concept continued to earn commissions on U.S. sales, and these were purportedly paid monthly from the account of VWPA. No documentary evidence of such payments was offered into evidence, however the total amount of the commissions appear as selling expenses on VWPA's 1992 and 1993 financial statements. *See* Pl.'s Ex. 58 at 7. The central question is whether the payments were for statutory "selling commissions" which were incurred "with respect to the imported merchandise." That depends upon whether Concept worked "for or on behalf" of VWPC during the time in issue, a matter of contract.[17]

---

[17] 19 U.S.C. § 1401a(b)(1)(B) implicates "any selling commission," of course, not agency, and a commissioned "selling agency" may in fact be an independent contractor, *i.e.*, "a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking[, who] may or may not be an agent." Restatement (Second) of Agency § 2(3). *See* Harold G. Rauschlein and William A. Gregory, *Agency and Partnership* 4 (1979). Concept was described during trial as a sales "agent" or as a "representative," but with full authority to accept

(continued...)

The reorganization of the affairs of Concept, VWPC and VWPA, around November 1989, apparently occurred on a "gentlemen's agreement." It is their intention in the undertaking which controls interpretation and must be discerned. *See*, *e.g., Beta Systems v. United States*, 838 F.2d 1179, 1185 (Fed. Cir.1988); *Firestone Tire & Rubber Co. v. United States*, 444 F.2d 547, 551 (Ct. Cl. 1971); *Dorf International Inc. et al. v. United States*, 61 Cust. Ct. 604, 611, 291 F. Supp. 690, 695 (1968). The entry documents submitted for review show formality in maintaining corporate separateness between VWPC and VWPA, and neither the commissions nor the charges the government advocates for dutiability were invoiced or otherwise specified as part of the VWPC-VWPA transfer price. However, an expressed price is only one indicia of the relevant import agreement. *See Chrysler Corp. v. United States*, 17 CIT 1049 (1993). Actions speak louder than words,[18] and where the parameters of agreement are unclear, conduct may manifest intention. *See*, *e.g.*, *Prudential Insurance Company of America v. United States*, 801 F.2d 1295, 1297 (Fed. Cir 1986); *Blackhawk Heating & Plumbing Co. v. United States*, 622 F.2d 539, 551 (Ct. Cl. 1980); *Consumers Ice Company v. United States*, 475 F.2d 1161, 1165-1167 (Ct. Cl. 1973). In the case of inconsistency, conduct controls. *Wagner Electric Corporation v. United States*, 36 A.F.T.R.2d 75-5898, 1975 WL 3594 (Ct. Cl. Trial Div. 1975).

---

[17](...continued)
orders from U.S. purchasers. Since Concept's selling efforts were apparently self-guided and without VWPC's or VWPA's supervision, the evidence supports finding that it operated as an independent contractor. The distinction matters little here, however.

[18] *See*, *e.g.*, *Forest of Dean Iron Ore Co. v. United States*, 106 Ct. Cl. 250, 65 F. Supp. 585, 587 (1946).

The Court's impression of the evidence adduced at trial is that activation of VWPA in 1989 did not appreciably alter Concept's perception of the entity it was assisting. At that point, Concept proceeded to write purchase orders on VWPA letterhead and was paid from VWPA's account, but as a general matter its day-to-day functions remained the same as it continued promoting and selling VWPC-made fabric, transmitting purchase orders to Canada, and trusting, apparently, that its monthly commission checks correctly reflected commissions earned. *See.* Tr. at 139. In general, the impression offered during trial by Mr. Paul Scher, a vice president of and partner in Concept, was that Concept dealt with "Victor," a company comprised of geographically dispersed business units.[19] The selling material used by Concept tends, if it tends, towards the impression left by Mr. Scher.[20] It is also of some significance that VWPC, through its personnel, directly promoted sales to U.S.

_____

[19] *See*, *e.g.*, Tr. at 196-197, 203-205, 207-209, 211-212, 214, 219-220 (Testimony of Paul Scher).

[20] Pl.'s Ex. 41, a pictorial brochure, was testified as showing the products of the various "mills" Concept represents, in particular, as the question was posed by counsel, "Victor Woollen Products." Tr. at 199. Plaintiff's Exhibit 42, described as the business card Concept uses in the representation of "various mills," lists "Victor Woollens (USA)." *See* Tr. at 200, 209-210. Plaintiff's Exhibits 40 and 43 through 48 are three-panel folders of bound swatches each containing as many as 30 or more colors of a particular fabric weight or type. Each folder displays an identical four-color face and back cover and similar layout. The fronts of four folders show "VICTOR" in bold type across a picture of a mechanical loom surrounded by rolls of fabric; the other two folders display "CLUB JACKET" across a drawing of a figure wearing a varsity jacket. In bold print towards the bottom of the front of these two folders appears "Victor." On the reverse of all the folders is printed in smaller type "VWP of America Inc." along with its Jackman, Maine post office box. All folders have written vertically along the right edge (in small pitch) "Printed in Canada". The two "CLUB JACKET" folders also display "Imprimé au Canada," and one of these folders also displays the name and address for Concept below Plaintiff's name and address. At the bottom are phone and fax numbers. This juxtaposition of "VWP of America" and Concept also appears on Plaintiff's Exhibit 49, a plaid swatch bound on a plastic hanger by a four-color display similar to those of the folders. Mr. Scher referred to the advertisements on direct examination as representing "Victor" or "VWP of America." Tr. at 200-203.

customers by assisting Concept with client meetings as needed.[21]  An overall impression is that VWPC intended to be, and was, benefitted to the extent its personnel were successful in stimulating U.S. sales. *See Young & Rubicam, Inc. v. United States*, 410 F.2d 1233, 1239 (Ct. Cl. 1969).

Given the apparent conduct of VWPC and/or Concept's perceptions of the bargain, the Court is unable to distinguish commissions paid to Concept as relating "solely" to VWPA's U.S. sales.[22] Concept exercised the power and, apparently, the authority to bind the sales which resulted between VWPC and VWPA as a consequence of its U.S. selling efforts.  *Cf.* HQ 544949 (Mar. 17, 1993). Accordingly, the Court finds that Concept worked "for or on behalf of" VWPC as well as VWPA during the time in issue and that the commissions paid to Concept were incurred "with respect to the imported merchandise."   The amounts are to be added to the claimed transaction values in accordance with 19 U.S.C. § 1401a(b)(1)(B).

---

[21]  *See* Tr. at 210-213, 216-218.

[22]  *See Prudential Insurance Co. v. United States*, 801 F.2d 1295, 1297 (Fed. Cir. 1986) (a contract implied in fact is "inferred as a matter of reason or justice from the acts or conduct of the parties."  *Cf. Copperweld Corporation v. Independence Tube Corporation*, 467 U.S. 752, 771 (1984); *Clougherty Packing Co. v. Commissioner*, 811 F.2d 1297, 1301 (9th Cir. 1987).  It may be noted that in HQ 545998, *supra*, Customs considered the dutiability of payments from an importer to a related-party promoter pursuant to a "co-promotion" agreement. The imported merchandise was an active medicinal ingredient which was combined in the United States with other ingredients to form a finished product which was marketed by the importer with the assistance of the related party. The "co-promotion fee" of the related party was a complex formula determined in accordance with a written co-promotion agreement provided to Customs. The appraiser took the position, with which Headquarters agreed, that the fees were not associated with the sale for exportation of the imported merchandise but were "based upon" the specific undertakings of the related party in promoting the sale of a brand name product finished in the United States.  Headquarters also concluded that the "price actually paid or payable" to the exporter/seller was kept "entirely separate" from the co-promotion fee paid to the related party. 1996 WL 910814 at *11-*13.  Suffice it to state that unlike HQ 545998, the apparent arrangement between Concept and Victor Woollen Products supports the conclusion here.

**C**

Lastly on the issue of charge-backs and commissions, the government contends the VWPC-VWPA transaction values cannot be determined because the expenses borne by VWPC and charged back to VWPA and the commissions paid to Concept were allocated over the entire fiscal period, not "per sale," and that because inconsistencies between the summary data and the back up data which were submitted were never resolved to Customs' satisfaction.  Def.'s Br. at 22-23.  Because the government raises the argument primarily with respect to the plaintiff's deductive and computed values, this issue will be considered in that context.

**II**

Assuming *arguendo* that the VWPC-VWPA transaction values can be accurately determined, they are to be compared with the values indicated on certain entry documents relating to transactions between Cookshiretex and Lou Levy & Sons.  The appellate decision requires determination of (1) whether Cookshiretex and Lou Levy & Sons are unrelated parties,[23] (2) whether the Cookshiretex-Levy merchandise was "identical" or "similar" to the VWPC-VWPA merchandise,[24] and (3) whether the VWPC-VWPA transaction value "closely approximated" the Cookshiretex-Levy transactions.

---

[23] Entities may "qualify" as "related parties" under the appellate decision.  175 F.3d at 1335-1338.  Related parties have traditionally borne a higher burden, *e.g.* in relation to claimed export value.  *See*, *e.g.*, *New York Credit Men's Adjustment Bureau, Inc. v. United States*, 64 Cust. Ct. 770, 314 F. Supp. 1246 (1970), *aff'd* 68 Cust. Ct. 319, 342 F. Supp. 745 (1972).

[24] "Identical merchandise" for purposes of this related-party matter means "merchandise that is identical in all respects to, and was produced in the same country as, but not produced by the same person as, the merchandise being appraised."  19 U.S.C. § 1401a(h)(2)(B).  "Similar merchandise" for purposes of this related-party matter means merchandise that "is like the merchandise being appraised in characteristics and component material," "is commercially interchangeable with the merchandise being appraised," and " was produced in the same country as, but not produced by the same person as, the merchandise being appraised."  19 U.S.C. § 1401a(h)(4)(B).

Column 33 of the Cookshiretex entry summaries answers the first question in the affirmative. *See* Pl.'s Br. at 13 n.3. Direct testimony was only to the point that VWPC and Cookshiretex are "competitors," but since nothing of record overcomes the presumption of correctness on the Cookshiretex entries, the matter resolves in favor of the plaintiff.

The difference between the entry dates of the plaintiff's plaids and the Cookshiretex plaids was approximately two months. The difference between the entry dates of the compared meltons was approximately four months. The government therefore challenges whether these differences constituted U.S.-bound export "at or about the same time as the imported merchandise" being appraised, arguing that the 90-day limitation in 19 U.S.C. § 1401a(d)(2)(ii) defines the extent of "at or about" in the context of 19 U.S.C. § 1401a(b)(2)(B). Def.'s Br. at 7-8. *See* 19 U.S.C. §§ 1401a (b)(2)(B) and (c)(1)(B). The Court disagrees. "At or about" requires only proximity in time, and for purposes of this matter the concern is only as to the time value of money. The entry summary and manufacturer's single country declaration[25] on Cookshiretex exhibit E-2 indicate only that the currency of settlement is "$" which obfuscates without clarification,[26] however the other Cookshiretex exhibits indicate the currency of settlement as US Dollars, and it therefore appears reasonable to assume that Cookshiretex exhibit E-2 follows this pattern. Rates of inflation over the period(s) under consideration in the U.S. market for the merchandise concerned are also relevant,

---

[25]  *See* 19 C.F.R. § 12.130(f)(1) (1992).

[26]  Exchange rate examination is obviated where comparative transactions are stated in US Dollars. *See*, *e.g.*, *AIMCOR et al. v. United States*, 141 F.3d 1098, 1110-1111 (Fed. Cir. 1998)

however evidence of such has not been provided by either party.[27] To support any determination here, the Court takes judicial notice of the producer price index for "woolen" products in the U.S. published by the Bureau of Labor Statistics, U.S. Department of Labor.[28] *Cf. Van Gelder-Fanto Corp. v. United States*, 41 C.C.P.A. 90, C.A.D. 534 (1953). Woolen product price differences between July 1992 and February 1993 in the U.S. (*i.e.* the period covered by this test case and including the relevant months for entry of the fabrics described in Defendant's Exhibits E-2 and E-7) were not significant and somewhat deflationary. On this basis, the Court concludes that the Cookshiretex entries offered for comparison were exported to the United States "about the time" that the fabrics described by the subject entries were exported to the United States. *See United States v. Reiner, Inc.*, C.D.C. 370, 35 CCPA 50, 50-57 (1947).

The Cookshiretex entries do not describe fabrics "identical" to the VWPC fabrics, since they vary by weight and wool content among other factors. *See* 19 C.F.R. § 152.102(d) (1992). To show that the Cookshiretex-Levy entries are "similar" to the VWPC-VWPA entries, the plaintiff compared a 17-ounce, 65% wool plaid from Cookshiretex exhibit E-2 against a VWPC 18/20-ounce, 60% wool plaid from Plaintiff's Exhibit 9 at page 25, and it compared 22-ounce, 80% wool navy and purple meltons from Cookshiretex exhibit E-7 against VWPC 23/25-ounce 75% wool navy and purple

---

[27] The government argues "there is clear evidence there were significant price fluctuations in the United States market during this period," apparently in reference to the fact, mentioned later in its brief, that certain of the plaintiff's U.S. sales were "higher than those used by VWPA" in the calculation of deductive values. *See* Def.'s Br. at 10, 13, referencing Pl.'s Exs. 9, 17 and 34. The argument, however, does not establish that circumstance as an appropriate comparative benchmark.

[28] The producer price indices for woolen products published by the Bureau of Labor Statistics, U.S. Department of Labor for July 1992, December 1992, and January 1993, were 104.9, 104.4, and 104.4, respectively (base year 1985 = 100) . *See* BLS Series ID PCU2231#316.

meltons from Plaintiff's Exhibit 9 at pages 13 and 19.[29]   On the subject of commercial

interchangeability, Mr. Duval's responses were somewhat contradictory, however in the end he

stated:

> [M]ost [U.S.] customers won't . . . see very much difference for a three, four,
> five percent difference in the blends.  Unless you are talking about
> [comparing] 100 percent wool and then 95, because then at 95 you cannot use
> a Woolmark and at 100 percent wool you can use a Woolmark.  So that
> makes a difference there, but not 80 percent or 75 percent, even most of the
> time at 70 percent.  Because we see that very often in the market [for] melton
> fabrics, 70 percent, 75, 80 percent sold at about the same prices at [*sic*] the
> customers.

---

[29]   Noting that the Cookshiretex fabric was "less heavy so there [are] less fibers in it, less processing," Tr. at 80, the plaintiff's witness, Mr. Duval, assumed the VWPC plaid chosen for comparison weighed an average of 19 ounces, or 89% of the Cookshiretex plaid. *See* Pl.'s Ex. 9 at 25.  Multiplying the price of the VWPC plaid by this factor, a "comparable" VWPC fabric was derived which Mr. Duval stated was 27 cents higher than the price of the "similar" Cookshiretex merchandise sold to Lou Levy & Sons.  He then performed a similar comparison with respect to a navy melton in Cookshiretex exhibit E-7.  This exhibit pertained to 42 "pieces" (*i.e.* rolls) of a 58/59 inch-width, 22-ounce weight ("per linear yard"), 80% wool, 15% nylon, 5% other fibers, which entered on July 30, 1992.  Of those pieces, 34 rolls, "2,100.90 mts" in length, were sold at a particular cost-insurance-freight ("CIF") price per square length.  Mr. Duval testified that the CIF price was "per meter" and that a "comparable" VWPC fabric is listed on Plaintiff's Exhibit 9 at page 13 as a 23/25-ounce navy melton, 75% wool, 20% nylon, 5% other fibers.  The invoice in Cookshiretex exhibit E-7  is illegible as to the per-length price, however the customs broker of the Cookshiretex fabric invoiced the CIF price as "per linear yard." *Compare* Cookshiretex exhibit E-7, p. 3, *with* p. 4.  At any rate, Mr. Duval adjusted the Cookshiretex fabric into a "per-yard" CIF price by dividing by 1.0936 (the claimed ratio of meters to yards), which reduced the Cookshiretex navy melton CIF price by 37 cents. Tr. at 86.  Next, Mr. Duval stated the difference in the weights of the fabrics was a factor of 0.9167 (22 ounces versus 24 ounces, average weight).  Multiplying the VWPC-VWPA navy melton price by this factor, Mr. Duval stated the VWPC-VWPA price of a "comparable" fabric, so derived, was 41 cents higher per yard than the Cookshiretex price to Lou Levy & Sons of "similar" merchandise, as adjusted.  The Court calculates that the VWPC-VWPA price would have been 4 cents higher if the Cookshiretex navy melton price had been unadjusted.  Mr. Duval conducted a similar analysis with respect to the Cookshiretex purple melton listed on Cookshiretex exhibit E-7  versus the VWPC purple melton listed on page 19 of Plaintiff's Exhibit 9 and concluded identical price difference(s). Tr. at 88.

Tr. at 72-73. Suffice it to state that the two VWPC-to-Cookshiretex comparisons fell within the five percent range of wool content adduced by Mr. Duval.

The government challenges the usefulness of the Cookshiretex exhibits for comparative purposes. The Cookshiretex plaid chosen from exhibit E-2 for comparison was a blend of 65% wool, 30% acrylic and 5% nylon, whereas the VWPC plaid chosen from Plaintiff's Exhibit 9 consisted of 60% wool, 25% polyester, and 10% acrylic. The government argues there was no evidence put forth that the 20% difference in acrylic content or the 25% polyester (in place of acrylic and nylon) content was acceptable or commercially interchangeable or that garments manufactured from the VWPC fabric were comparable or commercially interchangeable with garments manufactured from the fabric imported by Lou Levy & Sons. Def.'s Br. at 8-9. The government claims the "variety and breadth of outerwear (*e.g.* male *versus* female, formal *versus* athletic) is so great that simply stating that the wool content was similar does not constitute proof that the merchandise is at all similar or commercially interchangeable." *Id*. at 9.

The inquiry here, of course, is the fabric in its state as imported, not the fabric as further processed. *See* 19 U.S.C. § 1401a(c)(2). The government's point may well be true, and the testimony of the plaintiff's witness might be regarded as merely self-serving, however at trial the government's inquiry into commercial interchangeability focused solely on the wool content of apparel fabric in the United States market. It did not test the plaintiff's witness with inquiry into other factors which might impact commercial interchangeability, nor did it bring forth import specialist or other rebuttal to challenge the plaintiff's assertion that the deciding factor for commercial interchangeability was wool content, nor did it challenge the plaintiff's method of

comparing the Victor Woollen Product fabrics to the Cookshiretex fabrics. Accordingly, the Court regards the government's contention at this stage of the proceedings as speculation, and the plaintiff's proof on commercial interchangeability stands.

The government additionally asserts that Cookshiretex exhibit E-2 was likely for samples, and that a transaction for samples

> does not properly reflect upon the alleged arm's length nature of the[ ] style to which it is being compared, because there may be considerations that dictate a significantly lower price, outside the normal price structure for merchandise, in order to induce future large quantity sales of that fabric. This is best evidenced by VWPA's own invoices . . . which disclose[ ] that VWPA shipped sample merchandise at no cost.

*Id*. at 9-10, referencing Pl.'s Ex. 14 at 3, Pl.'s Ex. 21 at 3, and Pl.'s Ex. 22 at 3.[30] At the other extreme, the government contends that Cookshiretex exhibit E-7 involved a sale of over 2000 yards of material, whereas Plaintiff's Exhibit 9 describes only 152.50 yards of navy melton and 71.625 yards of purple melton. It argues that 19 U.S.C. § 1401a(b)(2)(C)(ii) mandates that differences in quantities must be taken into account based on "sufficient information," that if sufficient information is unavailable then the comparison cannot be made, that the plaintiff admitted discounts are provided for large-quantity sales, and that one cannot compare the two different volume transactions here because the price for the Cookshiretex transaction is, arguably, significantly less than that for transactions in smaller quantities such as the VWPC-VWPA transactions for the navy and purple

---

[30] The government additionally notes that Mr. Duval's statement to the effect that sample fabric is not sold at lower prices than sales of regular quantities but in many instances is sold at higher prices is undermined by these exhibits. Def.'s Br. at 10 n.1. The VWPA-U.S-purchaser sale price of the particular plaid being compared, at any rate, was greater than twice the price of the Cookshiretex plaid purchased by Lou Levy & Sons. *Compare* Pl.'s Ex. 9 at 21 *with* Cookshiretex exhibit E-2; *see* Def.'s Br. at 6, Tr. at 100-101.

meltons. *See* Def.'s Br. at 10, referencing Tr. at 103, 147, and 167. "For all we know," according to the government, "the unusually favorable price to Levy may have occurred because Levy purchased a close out of old stock." *Id.* at 11. *See generally* Tr. at 90-98, 100-103, 178.

The plaintiff argues that VWPA is a distributor which purchased about 1 million yards of apparel fabric over the year, whereas Lou Levy & Sons is an apparel manufacturer which purchased an estimated 5,000 to 10,000 yards of fabric per year. It argues that the differences in quantity and the commercial level of the respective transactions would only result in downward adjustment of the Cookshiretex-Levy prices, thus rendering the VWPC-VWPA prices even more favorable. Pl.'s Rep. at 7 n.3.

The statute requires consideration of and, as necessary, adjustment to the price of the Cookshiretex-Levy transaction to compensate for any volume effect on price, not the VWPC-VWPA transaction. *See* 19 U.S.C. § 1401a(b)(2)(C); 19 C.F.R. § 152.104 (1992). To approximate the quantity of the VWPC-VWPA sale, adjustment to the Cookshiretex-Lou Levy transaction to compensate for any volume discount would have been upward, not downward. The only testimony on the matter, however, concerns VWPA's volume discounts to end users,[31] and it would be speculative to consider whether the 2000-yard Cookshiretex transaction entailed an actual volume discount or what such an adjustment would have involved. *See* Tr. at 91. The Court considers that once the plaintiff's witness asserted that comparison of the transactions was appropriate, the burden shifted to the government to rebut. *See* 19 U.S.C. § 1401a(b)(2)(C) (commercial and quantity differences effecting the sale price are to be taken into account "whether supplied by the buyer or

---

[31] *See* Tr. at 103, 147, and 167.

otherwise available to the customs officer concerned"). *See also  S. Stern, Henry & Co. v. United States*, C.D. 3951, 64 Cust. Ct. 1, 308 F. Supp. 712, 716 (1970); *M.B.I. Merchandise Industries Inc. v. United States*, 16 CIT 495, 502 (1992)*. But cf. Border Brokerage Company v. United States*, R.D. 10759, 52 Cust. Ct. 567 (1964) (evidentiary standard for proving for usual commercial quantities). The government did not cross examine as to commercial or quantity differences or bring forth an import specialist who might have clarified the issue.  Thus, there is no reason to conclude that the quantity differences implies the Victor Woollen Product fabrics and the Cookshiretex fabrics are not "similar," and the fabric comparisons are not invalidated on the basis of the government's arguments.

On the other hand, the plaintiff contends that a "proper analysis would compare the total quantities of each of the Cookshiretex-Levy fabrics with the total quantities of the comparable VWPC-VWPA fabrics demonstrated by the record."  Pl.'s Rep. at 7, referencing Pl.'s Conf. App. I.  The Court agrees,  although such a statement might be construed as an admission that Mr. Duval's comparisons were insufficient, however the Court is unable to compare the total quantities of "each" of the Cookshiretex-Levy with the total quantities of "the comparable" VWPC-VWPA fabrics.  Mr. Duval himself stated that except for Cookshiretex exhibits E-2 and E-7, the exhibits were lacking too many terms in order to make useful comparisons with the Victor Woollen Product fabrics at issue here.  *See* Tr. at 75-77, 81-83.  *See*, *e.g.*, Cookshiretex exhibit E-1 at 3.  There was furthermore insufficient information put forth from which the Court might make meaningful comparisons on its own.[32] From the evidence presented, thus, the plaintiff has demonstrated that the Cookshiretex

---

[32]  The plaintiff submitted two price lists showing transfer prices from VWPC to VWPA for the 1991-1992 fiscal year and the 1992-1993 fiscal year (fiscal year beginning December 1st) .  Pl.'s Exs. 4, 5.  *See* Pl.'s Ex. 58.  The price list for the 1991-1992 fiscal year lists only prices of melton,
(continued...)

³²(...continued)
and these are apparently grouped into seven price categories ("P591," "0812 Natural," "0812 Color," "0912 Natural," "0912 Color & 189," "159 & 1959," and "90 Melton Dark"). The price list for the 1992-1993 fiscal year also lists these categories (although the sixth is listed as "159 & 1159") and also adds "Others" which includes "Baron & 1000," "Duffle 14," "WN008," "WN012 Light," "F8963 (20/22)," "F9018 (22/24)," "C9108 (18/20[)]," "WP090," "C9209 (14/16)," and "C9209 (16/18)." Pl.'s Ex. 5. It is unclear what "Others" are, but the documents show melton prices as having increased in each category by the same amount as compared with fiscal year 1991-1992 prices. The Court does not doubt the accuracy of the 1992-1993 price list, however a comparison with Plaintiff's Exhibits 6 through 40 shows that it is apparently incomplete and not always a reliable indicator of actual pricing. For example, the navy and purple meltons which were compared with Cookshiretex exhibit E-7 are in the "0912 Color" category. Two representative samples of 0912 transfer prices (for "Natural" and "Color") that occurred on May 21th and 25th, 1993 at the 1992-1993 price-list prices were submitted attached to the 1992-1993 price list, however entry of "0912 Color" and "0912 Natural" meltons also occurred on those dates at the 1991-1992 sale prices. *See* Pl.'s Exs. 6, 8, 11, 15, 16-17, 19, 22, 25, 27, 33-36, 38-40; Def.'s Ex. 5. VWPC also priced at least three fabrics to VWPA at the retail price to the U.S. purchaser. *See* Pl.'s Exs. 6 at 11-12, 34 at 16-17. The VWPC plaid compared with Cookshiretex exhibit E-2 was an 18/20-ounce "C9217" which appears nowhere on the 1992-1993 price list. The 1992-1993 price list shows plaids increasing in price as weight increases and the nearest comparable item may be the 18/20-ounce "C9108", however the entry documents show that VWPC and VWPA transacted both 18/20-ounce/yard plaids and 14/16-ounce/yard plaids at the same per-yard price which, for that matter, was 25 cents higher than the indicated price for "C9108." *Compare* Pl.'s Ex. 5, Cookshiretex exhibit E-2, *and* Pl.'s Ex. 9 at 25. Mr. Duval testified that the absence of certain terms in Cookshiretex exhibits E-1 and E-3 through E-6, for example color, rendered them useless for purposes of comparison. Tr. at 74, 76. The exhibits, deemed admissible, yield information nevertheless. Cookshiretex exhibit E-1 indicates entry of 165.29 yards 21-ounce/yard 80% wool melton for samples on December 21, 1992. The per-yard price of this fabric, by weight slightly lighter than VWPC 0912 meltons but containing 5% more wool, is almost identical to the transfer price between VWPC and VWPA of the "0912 Color" category. Cookshiretex exhibits E-3 through E-5 entered between July 30, 1992 and November 27, 1992 and describe 21-ounce/yard 80% wool melton which sold in volume far in excess of that of the plaintiff's transactions at an identical declared price per yard, nearly midway between inter-company listed prices for "0912 Color" and "0912 Natural." Also, the difference in price between "0912 Color" and "0912 Natural" meltons, based on either the 1991-1992 price list or the 1992-1993 price list, is substantial, as are the differences in volume and pricing of these Cookshiretex entries, whose entry documents, at any rate, indicate no color terms. Cookshiretex exhibit E-6 entered October 16, 1992 and describes 9 rolls, apparently 2,438.78 yards, of 21-ounce/yard 65% wool "plaid" and 32 rolls, apparently 679.99 yards, of 22-ounce/yard 45% wool "Navajo." On the other hand, the per-unit (yard) price of the entered Cookshiretex "plaid" was approximately 29% higher (adjusted for the difference in fabric weights) than the list price of VWPC's "C9108," the apparently nearest

(continued...)

exhibit E-7 melton is "similar" to and therefore comparable with 0912 Color meltons but not 0912

Natural fabrics or other VWPC meltons, and it has also demonstrated that the Cookshiretex exhibit

E-2 plaid is "similar" to and therefore comparable with the C9217/1 plaid in Plaintiff's Exhibit 9,

but it would be for Customs to determine, in the first instance, whether the transfer prices of the

VWPC-VWPA transactions, adjusted in accordance with the foregoing, "closely approximate" these

two Cookshiretex-Levy transactions in accordance with 19 U.S.C. § 1401a(b)(2)(B).  If remand is

necessary, Customs is not precluded from making additional comparisons, as appropriate, provided

it does not restrict the applicability of the foregoing.

## III

The plaintiff also offered deductive and computed value statements for comparison with the

VWPC-VWPA transfer prices to prove the appropriateness of transaction valuation or as alternate

---

[32](...continued)
comparable fabric on the 1992-1993 price list (again, it being unclear whether and to what extent such constitutes a category of fabric).  There was no evidence of similar merchandise for entries of tweeds, stripes and other fabrics not included on the 1992-1993 price list.  The VWPC tweeds were entered between 50% and 60% wool, mostly 55%, and weighed between 20 and 22/24 ounces per yard.  The stripes entered were all 75% wool and weighed between 18/20 and 22/24 ounces per yard. The plaintiff adduced at trial that the weight of a fabric was a significant indication of the amount of processing involved, Tr. at 80, however Plaintiff's Exhibits 6 through 40 indicate that price does not necessarily correspond therewith: striped fabrics with 75% wool may be priced higher than a heavier (ounce-per-yard) stripe with the same wool content; the "0912 Color" meltons apparently have the same weight and wool content as the "159" meltons, but the latter are priced substantially lower; and like the "0912 Color" meltons, the "0812 Color" meltons consist of 75% wool but weigh 19/20 ounces per square yard, are therefore 81.25% of the weight of the "0912 Color" meltons, but are list-priced at significantly less than 81.25% of the price of  "0912 Color" meltons.  Similarly, while many VWPC plaids of the same wool content were transferred to VWPA at the same price as the compared Cookshiretex exhibit E-2  plaid, a substantial number were transferred to VWPA at higher or lower prices, and not always due to apparent differences in wool content or weight. *Compare*, *e.g.*, Pl.'s Exs. 9, 22, 23, 27-29, 35, 37.  In short, it is impossible to extrapolate from Mr. Duval's comparisons to the record universe of Victor Woollen Product fabrics entered.

bases of valuation.  It contends that each statement accounts for all statutory profit and expense

elements and were prepared in accordance with generally accepted accounting principles from the

companies' actual accounting records.[33]  The government raises several points with respect to the

deductive and computed value statements.  First, it argues that the evidence submitted in support of

the deductive value statement did not  relate the "greatest aggregate quantity" sales to "at or about

the same time as the imported merchandise" in accordance with 19 U.S.C. § 1401a(b)(2)(B), which

could have occurred as late as 10 months after the importations in issue, and it argues the computed

value statement is similarly deficient because it "is not tied into the particular period of importations.

Def.'s Br. at 13, 20; Tr. at 289, 292-295, 360-361.  *See* 19 U.S.C. § 1401a(d)(2)(A)(i) and (ii); 19

U.S.C. § 1401a(d).

Second, the government argues that the exhibits supporting the deductive and computed

value calculations are themselves summary information and that the plaintiff failed to provide the

source documents either in response to discovery or at trial, a violation of Rule 1006 of the Federal

---

[33] The Statement of Administrative Action to the Trade Agreements Act of 1979 ("SAA") which accompanied the URAA states that "the determination of usual profit and general expenses under the provisions of deductive value would be carried out utilizing information prepared in a manner consistent with generally accepted accounting principles in the United States."  SAA at 460, reprinted in 1979 U.S.C.C.A.N. 665, 721.  Regarding the computed value statement, the plaintiff contends it was prepared in accordance with Canadian GAAP and cannot be rejected merely because different allocation methods might have been used.  *See* 19 U.S.C. § 1401a(g)(3) ("information that is submitted by an importer, buyer, or producer in regard to the appraisement of merchandise may not be rejected by the customs officer concerned on the basis of the accounting method by which the information was prepared, if the information was in accordance with generally accepted accounting principles").  The plaintiff draws upon the legislative history of 19 U.S.C. § 1401a(g)(3) "to allow the importer, buyer, or producer to prepare his figures in any one of a variety of acceptable methods" and "aid not only the Customs Service, but the importer as well, since he would be able to rely more on his own records than under existing law."  Pl.'s Br. at 18, quoting S. Rep. 249, 96th Cong., 1st Sess. 118 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 504, 508.  *See also id* at 23 referencing *Merck, Sharp & Dohme, Int'l v.United States*, 20 CIT 137, 139, 915 F. Supp. 405, 408 (1996).

Rules of Evidence[34] and necessitating disregard of the deductive and computed value statements in accordance with *Conoco Inc. v. Department of Energy*, 99 F.3d 387, 393-394 (Fed. Cir. 1996) (opposing counsel must be afforded an opportunity to review and object to the underlying documents, in order to guard against the risk of error or distortion). Def.'s Br. at 13-15. *Cf.* Tr. at 235-239, 243-245, 248, 276-277, 321-326, 442-444.[35]

---

[34] Federal Rule of Evidence 1006 provides: "The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court."

[35] Regarding arguable inconsistencies and unsupported figures appearing in Plaintiff's Exhibits 50 to 61, the government points to the testimony of its auditor, who "just wasn't able to find where some of the numbers were coming from." Def.'s Br. at 14. *See* Tr. at 442-443. Specifically, the government points out that: (1) the cost per fabric for the 90 melton does not match the figures in the blend sheets that were part of the computed value statement, Tr. at 445 (*see* Exhibit 50 at "02"); (2) there was no factual basis for the fringe benefit rate asserted thereon, *id.* (*see* Exhibits 50, 53); (3) the numbers contained on some of the blend sheets for total quantities blended and for dyed yards were considerably lower than some of the numbers used in the calculations, *id.* at 445-447 (*see* Exhibit 50 at 2-4, Exhibit 52 at 24); (4) the division of research and development between fabric and upholstery differed from what was allocated onto Exhibit 50, Tr. at 448 (*see* Exhibit 52 at 9); (5) the costs used in the computed value calculations did not appear in the trial balance and ought to have appeared therein if they had been in fact incurred, Tr. at 448-449 (*see* Exhibit 52 at 25, Exhibit 53); (6) there was no back-up data for the production figure which appeared in Exhibit 52 at page 26, Tr. at 449; (7) there were expense accounts included in the trial balance which were not included in Pl.'s Ex. 52 at pages 4-13, Tr. at 449-450 (*see* Exhibit 53); and (8) the trial balance indicated that VWPC allocated more than it paid for at least one account, Tr. at 450-451 (*see* Exhibit 52 and Exhibit 53 at 7-8). Def.'s Br. at 18. *See also* Tr. at 451-452. *Compare* Exhibit 53 *with* Exhibit 61. Furthermore, the government points out that the fact that Mr. Fournier himself could not verify many figures, including a large figure for salaries and administration, because he did not have "enough details to reconstruct" the figures. Def.'s Br. at 14; Tr. at 321-326. That, and the fact that various "drafts" of deductive values (with differing unit prices, general expenses, and/or profits) were created, the government contends, emphasizes the need for background data without which, the government further argues, the allocations or elements of deductive values and computed values proposed by VWPA are *per se* unreliable. Def.'s Br. at 14.

Third, the government takes issue with Victor Woollen Product's cost allocation methodology. Def.'s Br. at 18. The "costing" of fabrics for the U.S. market included material, direct labor, and indirect manufacturing or overhead costs the largest of which were management fees and administrative salaries allocated to VWPA. *See* Tr. at 233, 301-302, Pl.'s Ex. 60. The expenses allocated to VWPA were based upon the companies' total consolidated sales, which eliminated the effect of inter-company transfers and furthermore included VWPC's upholstery sales in Canada. The government argues that this is incorrect, that a proper ratio would have been based on total apparel fabric expenses to total apparel fabric sales, or total expenses including upholstery to total sales including upholstery, in either case on a non-consolidated basis because expenses were actually incurred upon inter-company transfer (according to testimony from Victor Woollen Products' accountant elicited during cross-examination). Def.'s Br. at 18-20. *See* Tr. at 313-315, 331-333, 420. *Compare* Tr. at 398-399 *with* Tr. at 416. The government points out that the witness for plaintiff's independent accountants could not specify the particular generally accepted accounting principles underlying the expense allocations and that he conceded, and that the effect of the methodology is to treat VWPA's sales and profits on the United States sales as part of VWPC's own sales and profit. Def.'s Br. at 20. *See* Tr. at 361-364, 419-420. Thus, that government argues, Victor Woollen Products' allocations are not in accordance with 19 U.S.C. § 1401a(d)(3)(i) and (f)(2)(C).. Def.'s Br. at 18-20. *See* Tr. at 316, 361.

Fourth, the government argues that Customs has "uniformly" required that any test values used to validate related-party transaction-value claims be "previously accepted." Def.'s Br. at 15, referencing HQ 543568 (May 30, 1986), HQ 546166 (Apr. 5, 1996), and HQ 546511 (Apr. 15,

1999).  *See* 19 U.S.C. § 1401a(b)(2)(B).  *See also* HQ 545481 (Sep. 14, 1994).[36] The government

contends this comports with a primary purpose of the valuation code: to eliminate the need for

Customs to conduct detailed investigations outside the United States.  Def.'s Br. at 16, citing

*Generra*, *supra*, 905 F.2d at 380;  *Moss Mfg.*, *supra*, 896 F.2d at 539.  Unless a test value has been

accepted by Customs in advance, the government contends, the claims of related party, multi-tiered

transactions become problematic, since most of the information relating to the first tier is outside the

United States.  According to the government, all of the information needed to verify a computed

value claim, and "a great deal" of the information needed to verify a deductive value claim, is outside

the United States.  Since the plaintiff's deductive and computed valuations were not submitted for

prior acceptance by Customs, the government therefore argues that "as a matter of law" they cannot

be used to test the plaintiff's transaction value claim.  Def.'s Br. at 15.

    The plaintiff raises several points in argument and in response.  First, it contends that the

government's witness conceded the possibility that the deductive value statement may be accurate,

and that the trial record shows the transfer prices reflected in the computed value statement cover

all of VWPC's manufacturing costs, including general expenses, plus a percentage for profit.

Second, it argues that the earlier audit report, Defendant's Exhibit C, has no bearing on the deductive

---

[36]  The government also contends that the interpretation is reasonable and entitled to deference under *Generra*, 905 F.2d at 379 (a point which appears to derive from *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984)).  The government further argues the interpretation amounts to a long-standing and contemporaneous construction of the statute by the agency charged with its administration, which agency actually drafted the provision being interpreted, and as such is entitled to great deference in accordance with *United States v. Zenith Radio Corp.*, 562 F.2d 1209, 1219-1220, 64 CCPA 130, 142-143 (1977), *aff'd*, 437 U.S. 443, 450 (1978).  Since the holding here is on other grounds, the Court need not delve into constitutional notions of deference.

values since it was limited to a review of the records of VWPC and production costs in Canada, and it has no bearing on the computed value statement because the audited production figures preceded the data relevant to this matter by two years. *See* Pl.'s Br. at 17-19 and 22; Pl.'s Ex 55, Ex. 58 at 2, Ex. 61 at 5; Tr. at 266-267, 289-290, 353-354, 427, 453, 487-489. *See also* 19 U.S.C. § 1401a(g)(3).

Third, it contends that an administrative policy requiring pre-approval of deductive and/or computed test values neither exists in the statute nor may be reasonably inferred therefrom, and that pre-approval of deductive and computed test values usurps this Court's jurisdiction to review Customs' appraisements and inhibits a party's right to trial *de novo*, an impermissible result. Pl.'s Rep. at 10-11, citing *American Grape Growers Alliance for Fair Trade, et al. v. United States, et al.*, 9 CIT 568, 622 F. Supp. 295 (1985) (rejecting an interpretation of 28 U.S.C. § 2645(c) which would render meaningless certain statutory grants of power to the court).

Fourth, it argues that it has presented evidence of deductive and computed test values which comport with the statutory scheme for substantiating related-party transaction values and which were prepared based on how the companies' records were actually kept in order to establish the principle of deductive and computed valuation. The plaintiff submits that the Court need not perform the actual calculations for each entry and fabric style in the test case but may remand to Customs pursuant to 28 U.S.C. § 2643 with instructions for calculation thereof. On the deductive values specifically, it argues that although this test case covers a limited number of entries, the cases on the suspension disposition calendar cover entries of fabrics for every month of the fiscal year, and it was therefore reasonable to submit deductive test values covering the entire year. *See* Tr. at 352-353. Using only the sales transactions before the Court as the basis for determining the greatest aggregate

quantity, the plaintiff argues that the transfer prices would still closely approximate its evidence of deductive value (as adjusted).[37]  It argues that the government does not contest that the deductive values were prepared in accordance with the statute based upon audited financial statements and that all of the government's other points pertain only to the proposed computed test values. Pl.'s Rep. at 11, referencing Pl.'s Exs. 55-61; Tr. at 267-268.  *See* 19 U.S.C. § 1401a(d)(2)(A)(ii).

Regarding the computed test values, the plaintiff contends that the government's primary criticism is that the government's auditor could not verify them at trial.  The plaintiff asserts that computed value information on the VWPC-VWPA transactions was submitted to Customs' auditor who had ample opportunity to verify the data but chose not to do so because of time limitations.  Tr. at 487, 489.  The plaintiff contends that the proper place for verification is during such an audit, not during trial, and that the lack of verification reduces defendant's criticism of VWPC's cost data to mere speculation.  Pl.'s Br. at 22 n.3.  *See Government Auditing Standards* 7.55 (1994). Furthermore, VWPA contends, even if the higher overhead rates the government asserts should have been used were in fact used, the computed values would still show a "reasonable overall profit."

Deductive valuation constructs values for "merchandise concerned," which is defined as "the merchandise being appraised," "identical," or "similar" merchandise. 19 U.S.C. § 1401a(d)(1). "Merchandise concerned" must also be in accordance with one of three situations described in 19 U.S.C. § 1401a(d)(2)(A). Pertinent to this related-party action are where "merchandise concerned"

---

[37]  In other words, the entries in this test case all occurred within 90 days of each other, the earliest occurring on November 18, 1992 and the latest on February 2, 1993, and using the VWPA resale prices of such entries to establish the prices at which the greatest aggregate quantities of each of the imported fabrics were resold within 90 days, VWPA argues that the VWPC-VWPA import prices still "closely approximate" (and in all but one instance exceeded) the deductive test values, as adjusted.  *See* Pl.'s Rep. at 12.

is either (i) "sold in the condition as imported at or about the date of importation of the merchandise being appraised" or (ii) "sold in the condition as imported but not sold at or about the date of importation of the merchandise being appraised" but is sold within 90 days after the date of "such importation." 19 U.S.C. § 1401a(d)(2)(A)(i) and (ii).[38] *See* 19 U.S.C. §1401a(b)(2)(B). The plaintiff's deductive value statement does not comply with such requirement to the extent that its original deductive value methodology utilized importations which were not sold within 90 days of the date of importation of "merchandise being appraised,"[39] however it has submitted an alternate version utilizing a 90-day period, which results in some of the greatest aggregate quantity resale prices being slightly higher than those used in Plaintiff's Exhibit 55 while others are slightly lower or unchanged. *See* Pl.'s Conf. App. II to Pl.'s Br. The plaintiff argues that such "closely approximates," and thereby proves, the VWPC-VWPA import prices.

The government's objections to the plaintiff's deductive value statement were mainly directed at the utilization of total consolidated sales for determining *pro rata* allocation of some expenses but not others. Tr. at 310-314. *See* Pl.'s Ex. 51 at 2; Pl.'s Ex. 58; Pl.'s Ex. 60 at 29. The Court does not find such method objectionable *per se*, in light of the fact that the plaintiff's entire operation consisted of the importation and distribution of one line of merchandise. *Cf. See National Carloading Corp. v. United States*, 60 CCPA 54, 469 F.2d 1398 (1972); *Hill Brown Corp v. United States*, 54 CCPA 99 (1967); *United States v. Mitsui & Co.,Ltd.*, 70 Cust. Ct. 301, 359 F. Supp. 1398

---

[38] "Such importation" refers to the date of importation of "merchandise being appraised," not the date of importation of "merchandise concerned." *See* S. Rep. 96-249, 96th Cong., 1st Sess. 122; H. Rep. 96-317, 96th Cong., 1st Sess 94-95.

[39] *See*, *e.g.*, HQ 546120 (Mar. 26, 1996).

(1973). The Court accepts the plaintiff's representations that the allocations were straightforward and in accordance with generally accepted accounting principles and reasonably reflect the impact of time and material invested by VWPC in the operation of VWPA. *Cf. Coats & Clark, Inc. v. United States*, C.S.D. 4581, 74 Cust. Ct. 13, 16 (1975) ("When plaintiff has proved a profit which is normal by reasonable standards and which is, on its face, realistic, the burden must shift to defendant to disprove the legitimacy and correctness of this profit"). On the other hand, at trial at various points the government asked for the sources for figures to support selling and administrative expenses (Tr. at 296; Pl.'s Exs. 58, 60), proration of rent (Tr. at 301), and the amount of time to process Canadian versus U.S. orders (Tr. at 306-308). The Court agrees with the plaintiff that Customs's admitted failure to verify cost data during audit undermines rejecting the computed values (due to discrepancies which might have been resolved at the time through examination of source documentation) on the basis of the audit, however the plaintiff at trial still bears a burden of proof on its claims to assist the Court in making a determination consistent with *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (1984) ("the [C]ourt's duty is to find the correct result, by whatever procedure is best suited to the case at hand"). Notwithstanding the excellent reputation of Victor Woollen Products' accountants, their examination of the books and accounts, and their certification of the financial statements, the evidentiary record lacks the source documentation necessary for accurate factual determination, which the defendant had a right to examine. *Cf. Camel Manufacturing Company v. United States*, 215 Ct.Cl. 460, 572 F.2d 280 (1978); *Lykes Bros. Steamship Co. v. United States*; 198 Ct.Cl. 312, 459 F.2d 1393 (1972)*; Equipment, Inc. v. United*

*States,* 1 Cl.Ct. 513 (1982).  That circumstance implicates the actual expenses pro rated to the account of VWPA and used to construct deductive value, in the eyes of the government.

Moreover, notwithstanding the wording of the deductive and computed valuation provisions,[40] at the judicial level a claimant bears the burden of overcoming the presumption of correctness attaching to an administrative valuation decision.  *See* 28 U.S.C. § 2639(a)(1).  The government challenged the sources which would support the profit and general expenses deduction on Plaintiff's Exhibit 55 and the allocations claimed on Plaintiff's Exhibit 50, and the record shows that the government did not fully contest the veracity of the expenses allocated to VWPA nor did it

---

[40] Deductive values of the "merchandise concerned" must be reduced by "an amount" equal to "any commission usually paid or agreed to be paid, or the addition usually made for profit and general expenses, in connection with sales in the United States of imported merchandise that is of the same class or kind, regardless of the country of exportation, as the merchandise concerned," and such "deduction made for profits and general expenses shall be based upon the importer's profits and general expenses, unless such profits and general expenses are inconsistent with those reflected in sales . . . of imported merchandise of the same class or kind . . . ."  19 U.S.C. §§ 1401a(d)(3)(A)(i) and 1401a(d)(3)(B).  The computed value statute is simpler:

> the amount for profits and general expenses . . . shall be based upon the producer's profits and general expenses, unless the producer's profits and general expenses are inconsistent with those usually reflected in sales of merchandise of the same class or kind as the imported merchandise that are made by producers in the country of exportation for export to the United States, in which case the amount . . . shall be based on the usual profits and expenses of such producers in such sales, as determined from sufficient information.

19 U.S.C. § 1401a(e)(2)(B).  Since transaction valuation requires "sufficient information whether supplied by the buyer or otherwise available to the customs officer concerned," there is a question as to the claimant's burden of proof.  *See* 19 U.S.C. § 1401a(b)(2)(C).  Customs on its own has considered salaries and wages, rent, taxes, travel, advertising, automotive expense, and contract services (all of which were designated as "general expenses" on the claimant's income statement) as not atypical of merchandise of the same class or kind and allowed deduction of such expenses from unit prices.  *See* HQ 545187 (Feb. 14, 1995, a/k/a "Valentines' Day") ("wedding gowns").

challenge whether the profits and expenses were "typical" of other importers or producers, nevertheless this Court considers it incumbent upon a claimant not only to produce the sources which will substantiate the profit and expense amounts claimed but to assert that the amounts claimed were typical of imported or produced (as the case may be) merchandise "of the same class or kind." *Cf. New York Credit Men's Adjustment Bureau, Inc.*, *supra*, 64 Cust. Ct. 770, 314 F. Supp. 1246; *Border Brokerage Company*, *supra*, R.D. 10759, 52 Cust. Ct. 567. The record is deficient in such respects, but there is a more fundamental reason why the methodology here is insufficient to the task of proving the acceptability of the claimed transaction values of the entered fabrics.

"The key to the resolution of valuation issues . . . is establishing an objective market-based price of the subject merchandise." *La Perla Fashions, Inc. v. United States*, 23 CIT __, __, 9 F. Supp.2d 698, 702 (1998), *aff'd* 185 F.3d 885 (1999). A central issue on remand is the acceptability for customs duty purposes of the transfer prices between VWPC and VWPA, and the statutory objectivity for related-party transaction valuation value is the requirement that the "merchandise concerned" in test deductive values or computed values consist of "identical" or "similar" merchandise.[41] 19 U.S.C. § 1401a(b)(2(B)(ii). *See* 19 U.S.C. §§ 1401a(h)(2), (h)(4). The deductive value and computed value methodologies proffered by the plaintiff are in essence, however, restatements of the challenged transfer prices: "the greatest aggregate quantity" sales used to determine the deductive values and the costs asserted in the computed values pertain to entries which

---

[41] Customs has determined that in order to analyze whether a particular test value closely approximates the transaction value of identical or similar merchandise, the test value must reflect a "previously accepted" customs valuation. *See* HQ 544455 (Mar. 14, 1995). *See also* HQ 545506 (Nov. 30, 1995); HQ 543568 (May 30, 1986). Since the result here is on other grounds, the Court need not consider whether this interpretation deprives a plaintiff of the right to *de novo* trial of such issue or whether the requisite objectivity might be satisfied through other means.

are themselves unliquidated and therefore unresolved, being the subject of this action or one suspended hereunder. Thus, the plaintiff's proffered deductive and computed values pertain not to "identical" or "similar" merchandise but rather to "the merchandise being appraised." Transaction valuation is not proven through such bootstrapping. *See Blue Bell, Inc. v. United States*, 213 Ct. Cl. 442, 449, 556 F.2d 1118, 1124 (1977).

### *Conclusion*

The deductive or computed values were also proffered in the alternative, in the event that the transaction value of the imported fabrics was determined unacceptable. *See* 19 U.S.C. § 1401a(a). The record lacks objective reference from which to infer that VWPA's and/or VWPC's claimed profits and expenses are typical of importers and/or producers of fabrics of the same class or kind, and it also lacks the source documentation which would resolve apparent discrepancies and reconcile certain amounts claimed. However, *Jarvis Clark*, *supra*, instructs that the correct result must be obtained "by whatever procedure is best suited to the case at hand." 733 F.2d at 878. In light of the appellate decision, remand to Customs is necessary, and the Court therefore compels the parties to work together diligently to resolve Customs' alleged concerns regarding inconsistencies and source documentation. If the plaintiff produces sufficient information within a reasonable time, Customs shall: (1) make the necessary adjustments to transaction value required by section I, *supra*, (2) determine whether the transacted values of fabrics which can be compared in accordance with section II, *supra*, are "closely approximate," and (3) value the remaining fabrics on the basis of deductive or, at plaintiff's option, computed value. Otherwise, Customs shall value the entries in accordance with 19 U.S.C. § 1401a(f).

Dated: August 29, 2001                    _____
       New York, New York                      R. KENTON MUSGRAVE, JUDGE